**BRIGGS & STRATTON CORPORATION,**
a Wisconsin corporation, Plaintiff,

v.

**CONCRETE SALES & SERVICES,**
et al., Defendants,

v.

**PEACH METAL INDUSTRIES, INC.,**
et al., Third–Party Defendants.

**No. 5:95–cv–525–1 (WDO).**

United States District Court,
M.D. Georgia,
Macon Division.

Sept. 28, 1998.

---

Daniel S. Reinhardt, David C. Vigilante, Atlanta, GA, for Briggs & Stratton Corporation, plaintiff.

Linwood Robert Lovett, J. Douglas Cowart, Macon, GA, for Concrete Sales and Services, Inc., A Georgia Corporation, defendant.

Linwood Robert Lovett, Macon, GA, Craig N. Cowart, Macon, GA, for Frances M. Coody, defendant.

Linwood Robert Lovett, J. Douglas Cowart, Macon, GA, Craig N. Cowart, Macon, GA, for Timothy A. McCord, defendant.

Robert C. Norman, Jr., Macon, GA, for Turner Ashby McCord, Jr., defendant.

Alvin E. DeGraw, Jr., Fort Valley, GA, pro se.

Edward H. Lindsey, Jr., Kathryn A. Cater, Atlanta, GA, for South Carolina Insurance Company, intervenor-defendant.

Michael Morgan Smith, Macon, GA, for Peach Metal Industries, Inc., third-party defendant.

William Michael Peterson, Warner Robins, GA, Ann H. DeGraw, Fort Valley, GA, for Ann H. DeGraw, as executrix of the Estate of Alvin E. DeGraw, Sr., third-party defendant.

Thomas W. Rhodes, Edward H. Wasmuth, Jr., Atlanta, GA, for Blue Bird Body Co. and Cardinal Mfg. Co., third-party defendant.

F. Kennedy Hall, Macon, GA, Thomas T. Terp, J. Steven Justice, Cincinnati, OH, for

Allied Chemical Corp. and Thiokol Corp., third-party defendant.

Carey M. Johnson, Joyce F. Mocek, Shawn M. Willette, Atlanta, GA, for Simplex Nails, third-party defendant.

## ORDER ON MOTION FOR PARTIAL SUMMARY JUDGMENT AND CROSS–MOTION FOR SUMMARY JUDGMENT

OWENS, District Judge.

Plaintiff, Briggs & Stratton Corporation, has filed a motion for partial summary judgment as to Counts I, II, III, V, VIII, IX, and X of its complaint and amended complaint[1] seeking contribution and indemnity for environmental clean-up costs against defendants Concrete Sales & Services, Inc. ("Concrete Sales"), Frances M. Coody and Timothy A. McCord, as Trustees for the Irrevocable trust of T.A. McCord, Jr. ("the Trustees"), Turner Ashby McCord, Jr. (referred to hereinafter as "T.A. McCord"), and Timothy A. McCord in his individual capacity. These individuals or entities will be sometimes referred to in this opinion as "the McCord defendants."

As to Concrete Sales and the Trustees, plaintiff Briggs & Stratton seeks summary judgment as to defendants' liability on Count I (CERCLA), Count II (HSRA), Count III (breach of contract), Count V (RCRA), and Count VIII (piercing the corporate veil). As to T.A. McCord, plaintiff seeks summary judgment on Count I (CERCLA), Count II (HSRA), and Count V (RCRA). As to Timothy A. McCord individually, plaintiff seeks summary judgment on Count IX of the amended complaint (CERCLA) and Count X of the amended complaint (HSRA). T.A. McCord has filed a cross-motion for summary judgment against Briggs & Stratton.

## I. Background

Third-party defendant Peach Metal Industries, Inc. ("PMI") leased from defendant T.A. McCord a site on Boy Scout Road in Byron, Georgia, from approximately 1971 until September of 1987. Alvin E. DeGraw, Sr., began the business in the early 1970s, and his son Alvin E. DeGraw, Jr., was an employee of PMI beginning in 1975 and an officer and shareholder from 1979 until PMI closed in 1987.

Defendant T.A. McCord purchased the property on which PMI operated its business from the United States Air Force on July 17, 1967. On November 30, 1984, T.A. McCord transferred title to the property to an irrevocable trust ("the McCord Trust" or "the Trust") set up by T.A. McCord for the benefit of his children and grandchildren and managed by his children Frances M. Coody and Timothy A. McCord as Trustees. On September 18, 1987, the Trustees sold the property to defendant Concrete Sales, Inc. ("Concrete Sales"), a corporation set up by the McCord defendants. The sole shareholder of Concrete Sales was the McCord Trust. Its directors were T.A. McCord, Timothy A. McCord, and Frances Coody, and its president was Timothy McCord. Title to the property is presently held by Peach County, Georgia, the property having been sold for taxes at a sheriff's tax sale on February 14, 1992.

### A. PMI's Generation of Hazardous Wastes

During the time period it leased the site from T.A. McCord, PMI generated hazardous wastes from its operation of a metal plating and finishing business. PMI performed zinc electroplating, cadmium electroplating, and aluminum anodizing at various times during its operations. Through May 30 of 1978 it used a cyanide zinc electro-

---

**1.** Count I seeks contribution and indemnity for clean-up costs under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. 9607(a), 9613(f), and 9613(g). Count II asserts claims under the Georgia Hazardous Site Response Act ("HSRA"), O.C.G.A. § 12–8–90 et seq. Count III alleges breach of contract. Count V is a citizen's suit brought under the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 et seq. Briggs & Stratton amended its complaint to add three additional counts: In Count VIII it seeks to pierce the corporate veil of Concrete Sales. Count IX is a claim under CERCLA against Timothy McCord individually. Finally, Count X is a claim under HSRA against Timothy McCord individually.

plating method utilizing cyanide salts, and throughout the remainder of its operations it used an acid chloride zinc plating method using potassium chloride or zinc chloride, boric acid, and zinc oxide. It also used nitric acid, hydrogen peroxide, and sulfuric acid in its plating process. Beginning in the early 1980s PMI conducted a black oxide process which used a heated caustic soda (sodium hydroxide) solution. The electroplating and black oxide processes generated various types of waste waters and sludges which contained residues from the various cleaning, plating and chromium conversion coating stages.

The Georgia Environmental Protection Division ("EPD") inspected the PMI facility in 1976 and informed PMI that its practice for discharging waste waters—which involved routing them through the old inoperational sanitary sewage system located on the property and discharging them onto the site with the runoff flowing offsite—was not suitable. PMI retained an engineering firm to design a discharge method suitable to EPD. The plan approved by EPD called for treatment of the waste waters to remove chromium, zinc and cyanide prior to discharge to a surface impoundment to prevent any offsite discharge. PMI constructed two lagoons or surface impoundments at the subject property and began to discharge its waste waters to them. However, PMI never implemented the waste water treatment steps required by the plan approved by EPD, and EPD did not follow through to insure that the waste water treatment plan was implemented. Thus, waste waters at times overflowed onto the property after the surface impoundments were constructed. PMI also failed to remove sludge which formed on the surface impoundments and contained substances such as cadmium, barium, lead, cyanide, and chromium. PMI did occasionally remove sludge from its electroplating tanks, which it stored in drums at the site.

In April and May of 1987 EPD again investigated PMI and concluded that the company was in violation of the Georgia Hazard-ous Waste Management Act and Rules. EPD issued a Notice of Violation to PMI which stated that PMI's electroplating operations generated hazardous wastes as defined under the U.S. Environmental Protection Agency's hazardous waste management regulations at 40 C.F.R. Part 261, that PMI's waste water discharge practices qualified the site as a hazardous waste storage, treatment and disposal facility, and that PMI had violated certain provisions of EPD's Hazardous Waste Management Rules. EPD proposed a consent order for execution by PMI to resolve the violations.

Alvin DeGraw, Jr., of PMI met with EPD on August 7, 1987, to discuss the work proposed under the consent order. After obtaining estimates for the cost of the work, he ultimately determined that PMI would not be financially able to comply with EPD's requirements. Thereafter PMI closed its business, ceased operations, and filed for bankruptcy protection.

### B. Environmental violations by plaintiff

In 1985 plaintiff Briggs & Stratton had closed business operations on a site it operated in Perry, Georgia. Briggs & Stratton had originally indicated to EPD in its closure plan that chemicals and plating solution at the Perry plant would be shipped to and used by its Milwaukee plant. On March 27, 1991, EPD issued a notice of violation to Briggs & Stratton after the company shipped containers of hazardous waste and chemicals containing hazardous substances to PMI and the PMI site. The shipments by plaintiff to PMI rendered plaintiff subject to liability under CERCLA as an "arranger" for the disposal of "hazardous substances," 42 U.S.C. § 9607(a)(3), and as a responsible party under 42 U.S.C. § 9613(f).[2] Defendants have briefed the court at length concerning plaintiff's shipments of hazardous waste to PMI and the extent of its culpability for contributing to the hazardous constituents on the property.

---

**2.** Because Briggs & Stratton is a responsible party under CERCLA, its claims against defendants are claims for contribution under 42 U.S.C. § 9613(f), rather than under 42 U.S.C. § 9607(a). However, the elements of a claim under both sections are the same insofar as establishing defendants' liability is concerned. *Redwing Carriers, Inc. v. Saraland Apartments,* 94 F.3d 1489, 1496 (11th Cir.1996).

The extent of plaintiff's liability insofar as it relates to a determination of the proper allocation of costs among all responsible parties is not yet before the court, however. The motion for partial summary judgment on plaintiff's claim for contribution under CERCLA and T.A. McCord's motion for summary judgment are directed only toward the issue of liability, with the extent of that liability and damages to be determined at a later date.

### C. Enforcement actions

Briggs & Stratton asserts that Timothy McCord met with DeGraw, Jr. on at least two occasions before PMI closed its business. According to plaintiff, the first meeting at the site was sometime after the EPD's inspection of the property in May, when DeGraw, Jr. told Timothy McCord that EPD had conducted two inspections of PMI's operations and that PMI was investigating what work would be required to satisfy EPD's requirements. Plaintiff submits that the two parties met again on at least one other occasion after DeGraw, Jr.'s August 17, 1987 meeting with EPD but before PMI closed its business; at that meeting DeGraw, Jr. told Timothy McCord about EPD's concern as to the environmental contamination at the site and advised him that PMI was not financially able to undertake correction of the environmental problems and would have to close the business. DeGraw, Jr. also testified that he offered to purchase the property from the Trust for a token amount but that Timothy McCord declined. Plaintiff asserts that PMI closed its operations no later than September 14, 1987, a date which is controverted by defendants.

According to Timothy McCord he had no conversations with DeGraw until sometime in August of 1987. Timothy McCord claims to have been unaware as a result of the meeting with DeGraw that PMI had generated hazardous wastes, that the state's inspection related to hazardous wastes, or that PMI's financial problems were related to the environmental problems. The McCord defendants claim that Timothy McCord was led to believe PMI would continue in operation, and

deny that DeGraw, Jr. made an offer to purchase the property.

After PMI closed its operations DeGraw, Jr. may have removed some empty drums from the property in an effort to perform some clean-up activities, a point that is denied by defendants. It is also disputed whether DeGraw, Jr. ever indicated to Timothy McCord that he intended to clean up the property. In any event, Timothy McCord denied DeGraw, Jr. further access to the property because PMI owed several months' rent.

PMI filed for bankruptcy on October 27, 1987, and the property was tied up in the United States Bankruptcy Court until May 4, 1988. On May 5, 1988, EPD notified Timothy McCord that the site was a hazardous waste treatment, storage and disposal facility that violated EPD's Hazardous Waste Management Rules and informed him that the owner of the site, Concrete Sales, was responsible for compliance with the Rules. EPD representatives visited the site on June 21, 1988 and noted that the buildings were deteriorating and that many of the drums were stored outside where they were subject to weathering and corrosion.

Timothy McCord met with EPD representatives in Atlanta on July 20, 1988. A compliance schedule was discussed at the meeting. EPD later admonished Timothy McCord not to remove materials from the property until submission and approval of a remediation plan. Although a remediation plan was submitted to EPD on October 20, 1988, no response was made from EPD at that time. On November 30, 1990, an EPD representative visited the site and observed no evidence of cleanup work having been performed. On December 13, 1990, EPD issued Notices of Violation to Concrete Sales, the McCord Trust, and T.A. McCord informing them that as owners of the site during PMI's operations they were responsible for the violations of EPD's Hazardous Waste Management Rules. None of the McCord defendants entered into EPD's proposed Consent Order.[3] Thus, on April 17, 1991,

---

3. The McCord defendants state that they did not sign the EPD Consent Order because the United States Environmental Protection Agency ("EPA")

stepped in and issued an Administrative Order in 1991 before they could do so.

EPD issued to Concrete Sales and the McCord Trust Administrative Order No. HW–645, incorporating the terms of the proposed consent order. The administrative order required Concrete Sales and the McCord Trust to submit a Part A application for a hazardous waste facility permit, to prepare and implement a groundwater monitoring plan for the site, to prepare an acceptable closure and contingent post-closure plan for the surface impoundments at the site, to submit a Part B application for a permit for the post-closure care of the surface impoundments if necessary, and to satisfy financial assurance requirements for the cost of the closure and post-closure care for the surface impoundments.

In September 1991 Concrete Sales submitted to EPD a Part A application for a hazardous waste facility, signed by Timothy McCord as president. The McCord Trust and Concrete Sales made some attempts thereafter to comply with the EPD order but ultimately notified EPD that they had limited financial resources to do so and that they were also pursuing potential insurance coverage. After issuing a notice of violation in August 1991 and a notice of deficiency in February 1992, EPD issued a final notice of violation to Timothy McCord on September 8, 1992, for failure to comply with certain conditions of Administrative Order No. HW–645. EPD noted that high concentrations of heavy metals had been detected in groundwater samples collected from the site and that rainfall was a cause of the continuing migration of the hazardous substances from the surface impoundments

On February 12, 1991, the United States Environmental Protection Agency ("EPA") issued Administrative Order No. 91–01–C to PMI, DeGraw, Jr., T.A. McCord, the McCord Trust, Concrete Sales, and Briggs & Stratton. The EPA Order required certain activities at the site which the Order characterized as Phase I and Phase II activities. On February 20, 1991, legal representatives of the McCord Trust met with EPD and indicated that they would finance over 50 percent of the Phase I removal required by the order. In March of 1991 plaintiff, Concrete Sales, and Timothy McCord as Trustee on behalf of the McCord Trust entered into an agreement to share in the performance of the Phase I

activities required. Briggs & Stratton agreed to perform the work described in Exhibit A to the Phase I Agreement, while Concrete Sales and the McCord Trust agreed to perform the work in Exhibit B, which included removing and transporting off-site all containers of chemical and other materials from Buildings C, D, and E, as well as removing debris, sweeping and steam-cleaning the floors and walls of the three buildings, and collecting and taking off-site the sweepings and rinsate thereby produced. Briggs & Stratton agreed to perform similar with respect to Buildings A and B and certain outdoor storage areas at the site. Concrete Sales and the McCord Trust also agreed to develop an impoundment contamination assessment work plan to characterize the type and amount of contamination in and discharged from the surface impoundments.

### D. Work performed by the McCord defendants and Briggs & Stratton

The Trustees entered into a written agreement with Ensite, Inc., to perform its work and certain services under the Phase I agreement. In January of 1991, before issuance of Administrative Order No. 91–01–C, Timothy McCord received an estimate from Ensite in the amount of $1,089,118.59 for the entire cleanup project. The costs of Ensite's cleanup efforts eventually far exceeded this estimate, and the Trustees became delinquent in paying its invoices. Consequently, Ensite terminated its agreement with the Trustees on December 16, 1991 before the work was completed. Briggs & Stratton thereafter completed the work under the Phase I Agreement for which the property owners were responsible.

The work performed by Briggs & Stratton, which was done with EPA's approval of its work plan, included the preparation of a Phase I container/building cleanup work plan as required by the EPA order, implementation of the Phase I container/building cleanup work plan, including removal and disposal of containers in Buildings A, B, C, D, and E and the outside storage areas of the site, removing and disposing of materials in process equipment and in the sanitary sewage package plant, and decontaminating empty drums

and buildings, including some containers which contained hazardous waste. EPA determined that cadmium, chromium and lead were contaminating the soil at the site and established cleanup levels for these substances. EPA also determined that soils in certain areas of the site may have been impacted by hazardous waste listed at 40 C.F.R. Part 261 and disposed of through PMI's waste water discharge practices. Plaintiff also performed the Phase II soil assessment and cleanup work in accordance with EPA work plans, and EPA accepted the reports plaintiff prepared discussing the soil assessment and cleanup. Plaintiff submits that it has incurred response costs in excess of $5,200,000 for removal work it performed in connection with the EPA order, a figure which defendants dispute.

## II. Discussion

### A. CERCLA

A plaintiff under CERCLA must demonstrate the following: (1) that the site in question is a "facility" as defined in 42 U.S.C. § 9601(9); (2) that a release or threatened release of a hazardous substance has occurred; (3) that the release or threatened release has caused plaintiff to incur response costs consistent with the "national contingency plan" ("NCP");[4] and (4) that the defendant is a "covered person" under 42 U.S.C. § 9607(a). *Redwing Carriers, Inc., v. Saraland Apartments*, 94 F.3d 1489, 1496–97 (11th Cir.1996). 42 U.S.C. § 9607(a) defines four categories of "covered persons" who may be liable under CERCLA: (1) current

owners and operators of the facility; (2) past owners or operators of the facility when disposal of hazardous substances occurred; (3) arrangers for disposal of hazardous substances; and (4) transporters of hazardous substances.

There is no dispute that the site in question is a facility in accordance with 42 U.S.C. § 9601(9),[5] in that hazardous substances[6] were deposited or disposed of on the site. Releases[7] of hazardous substances occurred during PMI's operations, and plaintiff has incurred response costs in cleaning up the hazardous substances. The Trustees have offered an argument, discussed later in this opinion, that they are not "covered persons" under CERCLA, but for the most part there is no real dispute on this point. Plaintiff asks the court to find (1) that Concrete Sales is liable as the current owner of the facility within the meaning of 42 U.S.C. § 9607(a)(1), or alternatively, as a past owner of the facility during the disposal of hazardous substances within the meaning of § 9607(a)(2); (2) that T.A. McCord and the McCord Trust are liable as owners of the facility during the disposal of hazardous substances within the meaning of § 9607(a)(2), and (3) that Timothy McCord individually is liable as an operator of the facility during the disposal of hazardous substances within the meaning of § 9607(a)(2).

#### (1) T.A. McCord

■ Briggs & Stratton seeks the imposition of CERCLA liability on T.A. McCord as the former owner of a facility under

---

4. The NCP is a body of regulations concerning the cleaning up of hazardous waste sites under CERCLA. **See** 42 U.S.C. § 9605(a) and 40 C.F.R. Part 300. Consistency with the NCP is not presently before the court, *cf. Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 n. 8 (noting split in courts as to whether party must show consistency with NCP as prerequisite to obtaining partial summary judgment on CERCLA liability, but declining to address issue on appeal since district court did not address it). Nevertheless, plaintiff remains responsible for proving NCP consistency with respect to its response costs.

5. 42 U.S.C. § 9601(9) defines "facility" as (A) any building, structure, installation, equipment, pipe or pipeline ..., well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, ... or (B) any site or area where a hazardous

substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; . . . .

6. The term "hazardous substance" is defined in 42 U.S.C. § 9601(14)(C) to include any hazardous waste listed under § 3001 of the Solid Waste Disposal Act, 42 U.S.C. § 6921. Section 3001 is within that portion of the Solid Waste Disposal Act that is referred to as the Resource Conservation and Recovery Act ("RCRA").

7. 42 U.S.C. § 9601(22) defines "release" as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment" (including the abandonment or discarding of barrels, containers, and other closed receptables containing any hazardous substances or pollutant or contaminant).

§ 9607(a)(2). T.A. McCord does not dispute that the PMI site qualifies as a "facility" within the meaning of CERCLA, that a release of hazardous substances occurred on the PMI site during his ownership, or that Briggs & Stratton incurred response costs—although the amount of the response costs is disputed. However, he argues that although he qualifies as a former owner he should not be held liable under CERCLA because of his lack of knowledge of or involvement with PMI's business practices.

T.A. McCord purchased the subject property from the United States Air Force in July of 1967 for the sum of approximately $26,000.00. The property consisted of approximately 9.5 acres with five buildings, and also contained an on-site sewage treatment plant, and an in-ground water well and water distribution system. Several years later McCord was approached by Alvin DeGraw, Sr., about leasing the property to operate a business that McCord testified he thought was a metal manufacturing business. A lease was entered into on August 9, 1971, and DeGraw, Sr. began operating PMI shortly thereafter. The lease provided that DeGraw, Sr. and his company were to make any improvements or additions to the property at their own expense and were to maintain the property in good order. After the first four years the lease between PMI and McCord converted to a month-to-month tenancy.

While PMI was in operation 1971 until 1987, it discharged waste waters containing hazardous substances into the environment. The hazardous substances included cadmium, chromium, lead, and cyanide which EPD and EPA detected in the soil, groundwater, and containers at the site.[8] These substances are hazardous substances under CERCLA because they qualify as hazardous waste under the Resource Conservation and Recovery Act ("RCRA"). See, e.g., U.S. v. Northernaire Plating Co., 670 F.Supp. 742 (W.D.Mich. 1987). During T.A. McCord's ownership of the site PMI discharged waste waters generated in its electroplating processes directly onto the site and into the surface impoundments without treatment to remove the haz-

ardous substances. The hazardous substances were later found on the ground, in the surface impoundments, and in the subsurface. T.A. McCord owned the property until November 30, 1984, when title was transferred to the McCord Trust. Thus, he owned the property during most of the years that PMI generated and disposed of hazardous wastes in the operation of its electroplating business.

McCord states that at the time he agreed to lease the property to DeGraw, Sr., he understood that DeGraw intended to operate a metal fastener manufacturing business involving "plating," but that he never had more than a very basic understanding of how the process was performed and never understood that plating involved the use of hazardous substances or the generation of hazardous wastes. McCord states he was not aware that in 1976 DeGraw, Sr. and DeGraw, Jr. had met with the Georgia EPD after EPD's inspection of the property in 1976, that PMI had failed to implement the waste treatment system required by EPD, or that EPD had visited the site and attempted regulation of PMI's operations between 1976 and 1981. McCord argues that the only action undertaken by PMI in response to the EPD's inspection—to dig the two lagoons or surface impoundments on the rear of the property—was done without his permission and was in violation of the terms of the lease. He also maintains that he never had knowledge of the existence of the surface impoundments until 1987–88 at the time of the EPD enforcement action against PMI.

McCord further argues that he was not involved in the formation of PMI. He provided no money, advice, or assistance to the DeGraws or to PMI, saw no financial records of PMI, and made no improvements to the property for the benefit of PMI. When he visited the property on one occasion and spoke to DeGraw, Jr. about late payments of rent he reminded DeGraw of his obligation to keep the property in good condition. On that occasion he states he saw no activity which would have indicated to him that PMI

---

8. In related insurance litigation, see *South Carolina Insurance Co. v. Coody*, 813 F.Supp. 1570 (M.D.Ga.1993), the McCord Trust filed the affidavit of a consultant who testified that hazardous

constituents released onto the property from 1984 through 1987 were the source of the contamination referred to in the EPD and EPA orders.

was discharging or disposing of any waste or wastewater from its operations. He argues he would not have transferred the property to his irrevocable trust for the benefit of his grandchildren if he had had reason to suspect that there might be environmental problems at the property. McCord further points out that by the time he received notification of the environmental problems at the site and his status as a potentially responsible party in a proposed consent order from the Georgia EPD in 1990, and at the time he received similar communications from the EPA shortly thereafter, he was already living in Florida where he was unaware of the activities of PMI.

■ CERCLA imposes strict liability upon the former owner of a facility regardless of whether he knew or should have known about the disposal of hazardous wastes. *United States v. R.W. Meyer, Inc.,* 889 F.2d 1497, 1507 (6th Cir.1989); *United States v. Monsanto Co.,* 858 F.2d 160, 168 (4th Cir. 1988). A limited exception to this rule is the narrow affirmative defense provided by 42 U.S.C. § 9607(b)(3). Notwithstanding his past ownership of the facility during the disposal of hazardous substances, T.A. McCord argues that he is an innocent third party pursuant to § 9607(b)(3) who should not be held responsible for PMI's operations. This section provides:

There shall be no liability under subsection (a) of this section for a person otherwise liable who can establish by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by—

. . . . .

. . . . .

(3) an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant . . . if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant

facts and circumstances, and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions[.]

■ A defendant relying on the third party defense must establish by a preponderance of the evidence all the elements of the statute: that a third party was the sole cause of the release, that the release of hazardous substances did not occur in connection with a contractual relationship with the defendant, that defendant exercised due care with respect to the hazardous substance, and that defendant took precautions against foreseeable acts or omissions of the third party. The third party defense cannot be asserted if even one of these elements is not satisfied. *See U.S. v. A & N Cleaners,* 854 F.Supp. 229, 239 (S.D.N.Y.1994).

Plaintiff argues that T.A. McCord has not satisfied any of the four elements of the third-party defense. However, it is unnecessary to analyze each element, because the lease between T.A. McCord and PMI constitutes in this court's view a contractual relationship between the two parties in connection with the release of hazardous substances. 42 U.S.C. § 9601(35)(A) provides that the term " 'contractual relationship,' for the purpose of section 9607(b)(3) of this title, includes, but is not limited to, land contracts, deeds or other instruments transferring title or possession, unless the real property on which the facility concerned is located was acquired by the defendant after the disposal or placement of the hazardous substance on, in, or at the facility, . . ." Leases have been held to be contractual relationships barring reliance upon the third party defense. *See U.S. v. Monsanto,* 858 F.2d 160 (4th Cir.1988); *U.S. v. Northernaire Plating Company,* 670 F.Supp. 742 (W.D.Mich.1987); *U.S. v. A & N Cleaners,* 788 F.Supp. 1317, 1326 (S.D.N.Y.1992).

McCord acknowledges that *Monsanto* and *Northernaire* both found that the existence of a lease to the premises where the tenant used hazardous substances in conducting its business precluded reliance on § 9607(b)(3). However, he argues that those cases did not adequately address the "in connection with" requirement, instead finding that the mere

existence of the lease was sufficient. The court's attention is directed to no authority clearly indicating that a lease to a tenant who releases hazardous substances on the leased premises is not "in connection with" the lease.[9] Regardless of the level of knowledge T.A. McCord possessed about PMI's metal plating and finishing business, the lease between McCord and PMI was "in connection with" the release of hazardous substances since the lease existed for the purpose of allowing PMI to operate its business necessarily involving the use of such hazardous substances on the premises. Because he had a direct contractual relationship with PMI in connection with PMI's acts resulting in the release of hazardous substances, T.A. McCord is not entitled to the third party defense of 42 U.S.C. § 9607(b)(3) and is liable under 42 U.S.C. § 9607(a)(2) as a former owner of the site during the disposal of hazardous substances.

### (2) The McCord Trust

Title to the subject property was transferred from T.A. McCord to the McCord Trust on November 30, 1984, while PMI was still in operation and was still generating hazardous wastes. The evidence shows that during the ownership of the McCord Trust PMI continued to discharge waste waters in the operation of its plating business. Further, hazardous substances continued to leach and migrate into the environment during the same period of ownership.

The Trustees argue that the McCord Trust cannot be a "person" under CERCLA because 42 U.S.C. § 9601(21), which is a list of specific entities that are to be deemed "persons," does not include "trust" or "trustee" and does not contain additional language allowing for the inclusion of additional entities. However, as the holder of legal title to the facility between November 30, 1984, and September 18, 1987, the McCord Trust was an "owner" of the property under the meaning of 42 U.S.C. § 9607(a). *See City of Phoenix v. Garbage Services Co.*, 827 F.Supp. 600, 602 (D.Ariz. 1993); EPA Memorandum on Principles of Trust and Trustee Liability under CERCLA, 57 Fed.Reg. 18344, 18349 (1994) ("EPA agrees with the commenters that, in most instances, the trust's assets are available for cleanup of a trust property"). Moreover, the Trustees argue that 42 U.S.C. § 9607(n)(1)[10] and § 9607(n)(4)[11] limit the liability of the

9. T.A. McCord cites *Westwood Pharmaceuticals v. National Fuel Gas Distr. Corp.*, 964 F.2d 85 (2d Cir.1992) (involving land sales contract and subsequent construction activities by purchaser resulting in contamination; sales contract held not "in connection with" construction by purchaser); *Reichhold Chemicals, Inc. v. Textron, Inc.*, 888 F.Supp. 1116, 1129–30 (N.D.Fla.1995) (landowner entitled to assert third party defense against polluter when only contractual connection was landowner's purchase of rosin and cooling water, which did not contribute to environmental contamination, from the polluter); *Shapiro v. Alexanderson*, 743 F.Supp. 268 (S.D.N.Y.1990) (acts or omissions occurred after contractual relationship was dissolved); and *Lincoln Properties, Ltd. v. Higgins*, 823 F.Supp. 1528, 1543 (E.D.Cal.1992) (payment of assessment to maintenance district for services not contractual relationship envisioned by Congress and, in any event, would not be contract in connection with the handling of hazardous substances). None of these cases lend support to McCord's position that his lease with PMI was not in connection with PMI's release of hazardous substances.

10. § 9607(n)(1) provides:

The liability a fiduciary under any provision of this chapter for the release or threatened release of a hazardous substance at, from, or in connection with a vessel or facility held in a fiduciary capacity shall not exceed the assets held in the fiduciary capacity.

11. § 9607(n)(4) provides in part:

(4) Safe harbor

A fiduciary shall not be liable in its personal capacity under this Chapter for:

(A) undertaking or directing any other person to undertake a response action under subsection (d)(1) of this section or under the direction of an on scene coordinator designated under the National Contingency Plan;

(B) undertaking or directing another person to undertake any other lawful means of addressing a hazardous substance in connection with the vessel or facility;

(C) terminating the fiduciary relationship;

(D) including in the terms of the fiduciary agreement a covenant, warranty, or other term or condition that relates to compliance with an environmental law, or monitoring, modifying, or enforcing the term or condition;

(E) monitoring or undertaking 1 or more inspections of the vessel or facility;

(F) providing financial or other advice or counseling to other parties to the fiduciary relationship, including the settlor or beneficiary;

(G) restructuring, renegotiating, or otherwise altering the terms and conditions of the fiduciary relationship

Trustees. However, § 9607(n)(8) also provides that "This subsection does not preclude a claim under this chapter against—(A) the assets of the estate or trust administered by the fiduciary." Thus, absent wrongdoing in their individual capacity the Trustees are not liable insofar as their personal assets are concerned but may be held liable in their fiduciary capacity to the extent of the assets held in the McCord Trust.

In their response to plaintiff's motion for partial summary judgment the Trustees state that they do not deny that hazardous substances were disposed of during the period of ownership of the McCord Trust, specifically citing *South Carolina Insurance Co. v. Coody*, 813 F.Supp. 1570 (M.D.Ga.1993). In their response to plaintiff's statement of undisputed material facts, however, they assert that although hazardous substances may have been disposed of at the site during the Trust's ownership, Briggs & Stratton has failed to provide sufficient proof of such fact. Plaintiff shows that EPD inspected the property in 1987 during the McCord Trust's ownership and discovered that PMI was disposing of hazardous wastes.[12] During the EPD inspection in May 1987 samples collected by EPD from the waste water in PMI's surface impoundment registered hazardous substances such as barium, cadmium, and chromium. Further, the McCord Trust admitted in its insurance litigation that hazardous wastes were disposed of at the property during its ownership period and that leaching and migration of hazardous substances had occurred at the site and would continue to occur. Additionally, the Part A application for a hazardous waste facility permit signed by Timothy McCord indicated that hazardous wastes had been managed in the surface impoundments constructed by PMI.

Analytical data obtained during the relevant time period shows that a waste water sample in 1976 registered hazardous substances used in PMI's processes such as chromium and zinc. These substances were also used by PMI during the McCord Trust's ownership of the site. The Trust has admitted that a sludge sample collected by EPD registered hazardous substances such as chromium, cadmium and lead. In light of these facts, the McCord Trust's admissions of related facts, and all the evidence in this case considered as a whole, it cannot be seriously disputed that PMI disposed of hazardous substances when it released waste waters during the time that the McCord Trust was the record owner of the facility and that leaching and migration of the hazardous substances continued to occur during ownership of the McCord Trust.

■ The Trustees assert as an affirmative defense the third-party defense set forth in § 9607(b)(3), discussed in the preceding section as to T.A. McCord. The Trustees argue that PMI's lease with T.A. McCord should not prevent their entitlement to this defense because the lease was never assigned to the McCord Trust and did not relate to the hazardous substances. They argue that the Trust did not directly or indirectly contract with PMI, that PMI paid the rent payment to T.A. McCord, and that PMI did not even know that the McCord Trust owned the property beginning in 1984.

The lease between T.A. McCord and PMI contained the following provision: "Each and every covenant, agreement, term, provision and condition herein contained shall extend to and be binding upon the respective heirs, legal representatives, successors and assigns of the parties hereto." Hence, plaintiff argues that under Georgia law, a conveyance of land by a lessor includes a transfer of the lease as one of the appurtenances running with the land. *See* 1 G. Pindar, *Georgia Real Estate Law and Procedure* § 11–26.1 n. 4 (4th ed.1993). We need not decide whether the lease between PMI and T.A.

---

(H) administering, as a fiduciary, a vessel or facility that was contaminated before the fiduciary relationship began;

(I) declining to take any of the actions described in subparagraphs (B) through (H).

**12.** CERCLA's definition of disposal is derived from the Solid Waste Disposal Act, which defines "disposal" as:

[T]he discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

42 U.S.C. § 6903(3).

McCord also constituted a contractual relationship between PMI and the McCord Trust, because the Trustees' reliance upon the third party defense in § 9607(b)(3) is clearly precluded by the Trust's failure to exercise due care or to take precautions against foreseeable acts or omissions by PMI during its operation at the site.

The EPD inspector who inspected the PMI site in April of 1987 indicated that the property was a "nightmare" with waste materials spilled over the ground, that the impoundments constructed by PMI had overflowed, and that the buildings were in bad shape with holes in the roofs. Larry Roberts, an employee of PMI, testified that the holes in the roofs on the premises were so large that "the people working in the plating line had to wear rain suits when it rained." The Trustees' failure to remedy these conditions showed a lack of due care. The lack of due care is further shown by Timothy McCord's failure to act after what he insists was his only meeting with DeGraw during the McCord Trust's ownership and before PMI went out of business. At that meeting he contends that he did not inquire into the problems identified by the EPD inspector or the changes required by the state, even after DeGraw informed him that PMI would be going out of business because of financial inability to correct the problems. Nor did McCord or anyone else on behalf of the Trust apparently observe, on this occasion or any other during the Trust's ownership, the obvious environmental problems at the property including the overflowing surface impoundments. To the extent that the Trustees remained ignorant over PMI's disposal practices, their ignorance can only be interpreted as willful or negligent and characterized by a lack of due care. Such willful ignorance precludes reliance on the third party defense. *See U.S. v. Monsanto,* 858 F.2d 160 (4th Cir.1988); *U.S. v. A & N Cleaners,* 854 F.Supp. 229, 243–44 (S.D.N.Y. 1994). Thus, the McCord Trust is liable under 42 U.S.C. § 9607(a)(2) as a former owner of the site during the disposal of hazardous substances.

**13.** Briggs & Stratton included Peach County as one of the defendants in this action as the present owner of the property. Plaintiff and Peach

### (3) Concrete Sales, Inc.

Plaintiff seeks to hold Concrete Sales liable as either the current owner of the property under § 9607(a)(1) or, alternatively, as the former owner during release of hazardous substances under § 9607(a)(2). Concrete Sales became the owner of the property on September 18, 1987, upon conveyance of the property by the McCord Trust. On February 14, 1992, the property was sold for nonpayment of taxes to Peach County, Georgia, pursuant to a sheriff's tax sale, and Peach County currently holds title to the property.[13]

Plaintiff asserts that Concrete Sales is the current owner of the property under CERCLA notwithstanding the fact that title to the property is in Peach County. Title 42 U.S.C. § 9601(20)(D) provides that an "owner" does not include a unit of state or local government which acquired ownership involuntarily through tax delinquency. Authority indicates that EPA interprets the terms involuntary acquisition or transfer under CERCLA "to denote any acquisition in which the government's interest in, and ultimate ownership of, a specific asset exists only because the conduct of a non-governmental party ... gives rise to a statutory or common law right to property on behalf of the government." 57 Fed.Reg. 18372 (April 29, 1992). Concrete Sales acknowledges that it would be liable as current owner provided that Peach County neither caused nor contributed to the release or threatened release of hazardous substances from the facility. However, Concrete Sales argues that because plaintiff has failed to plead that Concrete Sales is the current owner it should not be allowed to expand the pleadings on motion for partial summary judgment.

■ Because Concrete Sales clearly fits the definition of a previous owner holding title at the time hazardous substances were released pursuant to § 9601(a)(2), it is unnecessary to find it liable as a current owner under § 9601(a)(1). Concrete Sales argues that plaintiff's motion for partial summary judgment against it rests solely on its conten-

County subsequently entered into a settlement agreement, and Peach County is no longer a defendant herein.

tion that disposal of hazardous substances occurred during Concrete Sales' ownership of the site through the abandonment of containers of hazardous substances, leakage of hazardous substances from containers, and the leaching and migration of hazardous substances within the environment. Concrete Sales argues that it did not own the containers disposed of at the property by Briggs & Stratton and that it attempted through its attorneys to encourage Briggs & Stratton to remove their hazardous substances from the property as early as 1988. Moreover, Concrete Sales argues that plaintiff has failed to prove that any releases of hazardous substances occurred from the barrels that corroded and leaked during the period of its ownership.

There is affidavit testimony in this case from the consultants who performed the Phase I work under the EPA Order that containers at the PMI site were leaking. The affidavit of James A. Graham, an officer of Ensite, indicates that at the time Ensite performed its work the buildings at the PMI site were in a dilapidated condition and had holes in the roofs, that many of the containers in the buildings had deteriorated from exposure to the elements and were in poor condition, and that some of the containers were leaking and had to be overpacked or repackaged. Jerry Raeder, general manager of E & K Hazardous Waste Services (hired by Briggs & Stratton to perform work under Phase I of the EPA Order), testified in his affidavit that there was exposure of the containers in the buildings because of holes in the roofs as well as deteriorating and leaking containers. Evidence that the leakage from the containers included hazardous substances is demonstrated in an April 8, 1987 inspection report by Laura Waters of EPD. In her inspection report dated April 8, 1987, she noted that containers of caustic soda or sodium hydroxide, a hazardous substance under CERCLA, was leaking in the outside storage area. Although the April report was made prior to Concrete Sales' acquisition of the property in September, there is no evidence that anything was done to stop the leaking during the five-month interval before Concrete Sales acquired the property.

CERCLA uses the definition of disposal in the Solid Waste Disposal Act which defines

disposal to include "leaking." 42 U.S.C. § 6903(3); *see* note 12 *supra*. Thus, Concrete Sales is liable under § 9607(a)(1) as a former owner during the period of time that hazardous substances leaked from the containers that were abandoned on the property.

Additionally, courts have ruled that disposal includes the leaching of hazardous waste from a landfill. Thus, prior owners of contaminated property have been held liable under § 9607(a)(2) where hazardous substances that were initially discharged onto the site prior to a defendant's ownership continued to migrate in groundwater during defendant's ownership in a "passive release." *See, e.g., CPC International, Inc. v. Aerojet–General Corp.*, 759 F.Supp. 1269, 1277–78 (W.D.Mich. 1991); *Emhart Industries, Inc. v. Duracell International, Inc.*, 665 F.Supp. 549, 574 (M.D.Tenn.1987); *Nurad, Inc. v. William E. Hooper & Sons Co.*, 966 F.2d 837, 844–46 (4th Cir.), *cert. denied*, 506 U.S. 940, 113 S.Ct. 377, 121 L.Ed.2d 288 (1992). Other courts have refused to hold defendants liable for a passive release which did not involve some element of participation in the release. *See, e.g., United States v. C.D.M.G. Realty Co.*, 96 F.3d 706, 711 (3d Cir.1996); *United States v. Petersen Sand & Gravel*, 806 F.Supp. 1346, 1351 (N.D.Ill.1992).

In *Redwing*, 94 F.3d at 1510, the Eleventh Circuit Court of Appeals stated that CERCLA's definition of disposal is not limited to the initial introduction of hazardous substances into the environment but "should be read broadly to include the subsequent movement and dispersal of hazardous substances within a facility." *See also United States v. Waste Industries, Inc.*, 734 F.2d 159, 164 (4th Cir.1984), and *American Mining Congress v. U.S. EPA*, 824 F.2d 1177, 1196 (D.C.Cir. 1987). Concrete Sales argues that the *Redwing* court's statement tends to support the line of cases holding that a passive disposal is not a disposal under CERCLA because the court found that gas line repair work and repaving a parking lot did not amount to a disposal. This finding, which resulted in a ruling against plaintiff Redwing, was based on the fact that there was no evidence that either the repair work or the paving resulted in the movement or actual disposal of con-

taminated soil. *Id.* By way of contrast, even the *McCord Trust's* consultant testified in the insurance litigation that leaching and migration of hazardous substances had occurred at the site and would continue to occur. The passive leaching and migration is additional evidence of the release of hazardous substances during the period of ownership of Concrete Sales.

Finally, Concrete Sales argues that it is also entitled to the third party defense set out in § 9607(b)(3). For the reasons discussed in preceding Section II.A.(2) regarding the McCord Trust, the court holds that Concrete Sales is not entitled to rely on this defense. Consequently, Concrete Sales is liable under § 9607(b)(2) as the owner of a facility at the time of the release of hazardous substances.

### (4) Timothy McCord, individually

■ Plaintiff alleges that Timothy McCord in his individual capacity is liable as an operator of the facility during the disposal of hazardous substances under 42 U.S.C. § 9607(a)(2). Shareholders and officers of a corporation may be held directly liable as operators of a facility notwithstanding the existence of the corporate form. Imposition of such liability is based in this circuit on the "actual control" standard for operator liability. By this standard a shareholder or officer is held responsible only when he

(1) actually participated in the operations of the facility ... [o]r in the activities which resulted in disposal or (2) actually exercised control over, or was otherwise intimately involved in the operations of, the corporation immediately responsible for the operation of the facility.

*Jacksonville Electric Authority v. Bernuth Corporation,* 996 F.2d 1107, 1110 (11th Cir. 1993), quoting *Levin Metals Corp. v. Parr-Richmond Terminal Co.,* 781 F.Supp. 1454, 1456–57 (N.D.Cal.1991).

In *Jacksonville,* the owner of property contaminated by a former wood treatment facility sued Tufts University to recover cleanup costs. Tufts University had held most or all of the stock of the company that had owned the facility between 1926 and 1942. The court found that mere ownership of stock in a corporation that disposed of hazardous waste was not sufficient to hold a shareholder liable and that "[t]he plain language of the statute leads to the conclusion that a person is liable as an 'operator' when that person actually supervises the activities of the facility. That is, the person must play an active role in the actual management of the enterprise." *Jacksonville,* 996 F.2d at 1110. Under this standard the *Jacksonville* court found insufficient evidence that Tufts University was either actively involved in Eppinger's business affairs or that Tufts actually participated in the contamination. *Id.* at 1111.

The court again discussed the standard for operator liability in *Redwing.* There, Redwing Carriers' trucking terminal facility became contaminated with tar and other substances as a result of the trucking activities. Defendant Saraland, a partnership, became the owner of the property and contracted to build an apartment complex on the site. During construction a subcontractor encountered contaminated soil and deposits of tar caused by Redwing. Tar eventually began to seep to the surface after a parking lot was repaved and maintenance was performed on an underground gas line. *Id.* at 1494. Redwing claimed that Marcrum Management Company, which it had hired to manage the apartment complex, was liable as an operator under 42 U.S.C. § 9607(a)(1). In that role Marcrum prepared annual budgets, inspected the complex, ordered the resident manager to implement major improvement and repair programs and make specific repairs, received and dealt with complaints from tenants, prepared proposed rent increases for approval by the partnership and HUD, and was partly responsible for remedying tar seeps appearing on the property. *Id.* at 1509–10. The court reversed the district court's grant of summary judgment in favor of Marcrum, holding that the activities of Marcrum were sufficient to support Redwing's claim that Marcrum was responsible as an operator of the apartment site because of its actual involvement in the occupational business affairs of the apartments. *Id.* at 1510.

In *U.S. v. Amtreco,* 809 F.Supp. 959 (M.D.Ga.1992) this court had occasion to consider the question of operator liability of a party who was sole stockholder, sole director,

and president of a corporation. We found that because Dickerson, the sole stockholder of Amtreco, had the authority to control hazardous waste disposal practices for the corporation and was an active participant in Amtreco's management he was liable as both an owner and operator of the site. *Amtreco*, 809 F.Supp. at 966. In reaching the holding in *Amtreco* we relied on *New York v. Shore Realty Corp.*, 759 F.2d 1032 (2d Cir.1985). In *Shore Realty*, defendant LeoGrande was sole shareholder and officer in a realty company that acquired contaminated property for development. At the time the realty company purchased the subject property LeoGrande was aware that it had been contaminated by a tenant. Although he evicted the tenant, his company neither developed the property nor attempted to abate the environmental problems. The Second Circuit found LeoGrande liable as an operator based upon the fact that he made all corporate decisions and was responsible for corporate actions of the realty company.

■ Timothy McCord's position relative to Concrete Sales is similar to that of Leo-Grande in *Shore Realty*. As discussed above, it cannot be seriously disputed that Timothy McCord knew the property was contaminated at the time he arranged for the transfer of title from the McCord Trust to Concrete Sales. Plaintiff points to the following undisputed acts or omissions of Timothy McCord as evidence of his involvement in the business affairs of Concrete Sales with regard to the contaminated property: after Concrete Sales purchased the site Timothy McCord locked out PMI and met with De-Graw to prepare an inventory of certain materials at the site; he allowed further deterioration of the site and allowed containers of hazardous substances to remain exposed to the elements and to continue to leak; he allowed Concrete Sales to become delinquent on the payment of taxes and to be administratively dissolved by the Georgia Secretary of State; he corresponded with PMI's bankruptcy trustee regarding conditions at the site and corresponded and met with EPD regarding regulatory violations at the site; and he represented Concrete Sales with respect to EPD Order No. 645, including signing the hazardous waste facility permit application on behalf of Concrete Sales.

Timothy McCord acted on behalf of Concrete Sales as a director and as president. There is no evidence that the other directors, T.A. McCord or Frances M. Coody, exercised any authority with regard to Concrete Sales. The actions of Timothy McCord demonstrate that he actually exercised control over Concrete Sales, the corporation immediately responsible for the operation of the facility. His actions and omissions in this capacity render him liable under § 9607(a)(2) as an operator of the site during the disposal of hazardous substances.

In Count VIII of its amended complaint Briggs & Stratton asks the court to pierce the corporate veil of Concrete Sales. We have found Timothy McCord, director and president of the corporation, to be individually liable as an operator of the site. The McCord Trust, which is the sole shareholder of Concrete Sales, has been found liable as a former owner of the site. T.A. McCord, also a director of the corporation, has been found liable as a former owner of the site. Plaintiff does not claim that Frances M. Coody, the remaining director of Concrete Sales, actually exercised control over the corporation. In view of these facts, it is not necessary to determine whether these defendants should face additional derivative liability based on piercing the corporate veil of Concrete Sales.

### III. RCRA Citizen Suit

Briggs & Stratton alleges that T.A. McCord, the McCord Trust, and Concrete Sales are liable to it under the citizen suit provision of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(a)(1)(A). Plaintiff seeks to enforce the responsibilities of these three defendants to comply with the Hazardous Waste Management Rules of EPD appearing at Chapter 391–3–11 of the Rules and Regulations of the State of Georgia, GA.COMP.R. & REGS.T. 391–3–11.

Title 42 U.S.C. § 6972(a)(1)(A) of RCRA provides:

Except as provided in subsection (b) or (c) of this section, any person may commence a civil action on his own behalf—

(1)(A) against any person ... who is alleged to be in violation of any permit,

standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to this chapter; . . .

. . . The district court shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce the permit, standard, regulation, condition, requirement, prohibition, or order, referred to in paragraph (1)(A). . . .

Although there is some authority that § 6972(a)(1)(A) does not apply to past violations, citizen suits have been allowed against prior owners and operators to remedy continuing violations resulting from past disposal practices including the performance of proper closure and post-closure care. *Toledo v. Beazer Materials and Services, Inc.*, 833 F.Supp. 646, 655–56; *Gache v. Town of Harrison*, 813 F.Supp. 1037, 1040–42 (S.D.N.Y. 1993). Plaintiff's claim under RCRA is based on its charge that after PMI ceased operations in 1987 there continued to be present at the site illegally discharged hazardous waste, constituting a recurring violation of hazardous waste regulations.

Pursuant to § 6926 of RCRA, Georgia is an authorized state to implement RCRA by enforcing its own hazardous waste regulatory program, which it does through the Georgia Hazardous Waste Management Act and Rules. The Rules and Regulations of the State of Georgia, GA.COMP.R. & REGS.T. 391–3–11, incorporate by reference most of EPA's hazardous waste regulations at 40 C.F.R. Part 260 *et seq.* The regulations apply to both owners and operators of a hazardous waste treatment, storage or disposal facility. In addition, O.C.G.A. § 12–8–71(b) provides that EPD may issue an order requiring corrective action to any person who has contributed or is contributing to such release, including any past or present owner or operator of a hazardous waste treatment, storage or disposal facility who has contributed or is contributing to such release. GA. COMP.R. & REGS. r. 391–1–11–.11 makes specific reference to both owners and operators as being required to obtain a permit for a hazardous waste treatment, storage or disposal facility.

█ T.A. McCord argues that he is not subject to the EPD rules because he did not contribute to the release of the hazardous

substances. However, defendants have been held liable as past owners under RCRA based on their failure to investigate or to abate the conditions on their property even though they were not directly responsible for the conditions. *See United States v. Price*, 523 F.Supp. 1055, 1073 (D.N.J.1981); *Environmental Defense Fund v. Lamphier*, 714 F.2d 331 (4th Cir.1983). Although McCord was not directly responsible for the release of hazardous waste on the site and maintains that he was unaware of PMI's construction of the surface impoundments, this fact does not necessarily relieve him of responsibility as a past owner for the conditions at the site, which is predicated on his failure to investigate and abate the conditions on his property.

█ The McCord defendants contend that a consent order entered into with the State of Georgia concerning the PMI facility moots all of plaintiff's claims under RCRA. The consent order was entered into on December 16, 1997, between the State of Georgia, plaintiff Briggs & Stratton, the McCord defendants, and Peach County, Georgia. Under its terms the State of Georgia agrees to be responsible for further remediation activities at the PMI site and relieves the defendants of further obligations with respect thereto. The consent order specifically provides, however:

[N]otwithstanding anything to the contrary, "matters addressed" in this Consent Order for the purposes of contribution protection shall not include . . . (b) claims relating to such work and costs which are maintained in Civil Action No. 5:95–cv–525–1 in the United States District Court for the Middle District of Georgia between [Briggs & Stratton], the McCord Trust, Ashby McCord [T.A. McCord], CSS [Concrete Sales], and DeGraw, Jr., among others ("the Civil Action"). This Consent Order shall not be construed to preclude the enforcement of the Respondents' alleged obligations and liabilities under the Resource Conservation and Recovery Act, 42 U.S.C. § 6921, *et seq.*, as amended, or the Georgia Hazardous Waste Management Act, O.C.G.A. § 12–8–60, *et seq.*, as amended, in connection with the citizen suit claim in the Civil Action under 42 U.S.C. § 6972(a)(1)(A).

Thus, the consent order by its terms does not affect Briggs & Stratton's right to pursue its claim under RCRA. Moreover, plaintiff seeks enforcement of the continuing violations of the HWMA only to the extent that the violations are not remedied by the consent order. Additionally, plaintiff points out that the consent order was issued under the Georgia Hazardous Site Response Act rather than the Resource Conservation and Recovery Act or the Hazardous Waste Management Act rules. Thus, the work performed by the State of Georgia under the HSRA would not necessarily be in compliance with RCRA.

The remaining grounds asserted by defendants do not defeat plaintiff's entitlement to pursue its RCRA claim. 42 U.S.C. § 6972(b)(2)(B) provides that no action may be commenced under Section (a)(1)(A) "if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States or a State to require compliance with such permit, standard, regulation, condition, requirement, prohibition, or order." Defendants argue that the execution of the consent order bars plaintiff's pursuit of its RCRA claim. However, this lawsuit had already been commenced prior to execution of the consent order; thus, the consent order does not bar the RCRA claim. Moreover, the previous actions of the EPD leading up to the issuance of the consent order, including issuance of the administrative order pertaining to the site in 1991, cannot be characterized as diligent prosecution of a civil or criminal action as contemplated by the statute. *See Orange Environment, Inc. v. County of Orange*, 860 F.Supp. 1003 (S.D.N.Y.1994); *Coalition for Health Concern v. LWD, Inc.*, 834 F.Supp. 953 (W.D.Ky.1993), *rev'd on other grounds*, 60 F.3d 1188 (6th Cir.1995).

Finally, plaintiff's status as a CERCLA plaintiff seeking cost recovery does not bar it from filing a citizen suit under RCRA. The Seventh Circuit held in *AM International Inc. v. Datacard Corporation*, 106 F.3d 1342, 1349:

> While we agree with AMI that the idea behind citizen suit enforcement is to unleash an army of private attorneys general

to force cleanup when the government drags its feet, the plain language of RCRA and CERCLA does not exclude parties like Datacard [a potentially responsible party under CERCLA] from the class of potential citizen suit plaintiffs. Rather, both RCRA and CERCLA allow "any person" to bring citizen suits. RCRA § 7002(a), 42 U.S.C. § 6972(a) (conferring standing on "any person"); CERCLA § 310(a), 42 U.S.C. § 9659(a) (same). As a result we find that Datacard is a proper citizen suit plaintiff.

We find the reasoning of *Datacard* persuasive as to plaintiff's right to pursue its citizen suit to enforce compliance with the HWMA Rules to the extent that the consent order does not adequately address the matter. Nevertheless, it remains to be seen as a practical matter what, if anything, will remain to be accomplished under the HWMA rules after the work performed by EPD under the consent order is completed.

Finally, as to defendants' objection that plaintiff's only purpose in bringing its RCRA claim is to recover attorney fees that would otherwise be unavailable, the parties' attention is drawn to 42 U.S.C. § 6972(e) providing that the court may award costs of litigation, including reasonable attorney and expert witness fees "whenever the court determines such an award is appropriate." An award of attorney fees to plaintiff under this section will not be made absent justification. *Cf. Datacard*, 106 F.3d at 1352 (remanding to district court for further explanation of justification in awarding attorney fees).

## IV. Other claims

### A. Georgia Hazardous Site Response Act

Plaintiff alleges that the McCord defendants are liable under the of the Georgia Hazardous Response Act ("HSRA"), O.C.G.A. § 12–8–90, *et seq.*, for the costs of response work, including all attorney fees, with the amounts to be proven at trial.

There is as yet no case law interpreting the liability provisions of HSRA. However, HSRA is based largely upon the liability provisions of CERCLA,[14] and creates a pri-

---

**14.** The McCord defendants argue that the HSRA claim is merely an add-on claim which adds

nothing of substance to plaintiff's CERCLA

vate right of action for recovery of the costs of corrective action from "any person who has contributed or who is contributing to a release." O.C.G.A. § 12–8–96.1(e). The provisions of HSRA are to be applied retroactively to "releases of hazardous wastes, hazardous constituents, and hazardous substances, without regard to when the releases may have occurred." O.C.G.A. § 12–8–91(a).

■ O.C.G.A. § 12–8–96.1(e) provides that a contribution right is available only to a person who has undertaken "voluntary corrective action." Although HSRA does not define "voluntary corrective action," O.C.G.A. § 12–8–96.1(a) provides that the EPD shall notify responsible parties of "the opportunity to perform voluntary corrective action in accordance with an Administrative Consent Order entered into with the director." T.A. McCord argues that it is clear when reading these provisions together that the "voluntary corrective action" referred to in the contribution provisions refers only to actions taken pursuant to a Consent Decree with EPD.[15] The court views § 12–8–96.1(a) as providing only one example of voluntary restrictive action and declines to adopt the strict interpretation espoused by T.A. McCord.

■ The McCord defendants assert as defenses to plaintiff's HSRA claim the same defenses asserted in relation to the CERCLA claims, i.e., the Trust's status as a "person" and the third party defense of § 9607(b)(3). HSRA's third party defense, appearing at O.C.G.A. § 12–8–96.1(c), provides that the act or omission by the third party must not have occurred in connection with a direct or indirect contractual relationship with the third party and, in addition, one asserting the defense must not have a relationship with the third party. The relevant portion of the statute reads:

(c) No person shall be liable for costs or damage pursuant to this Code section if he can show by a preponderance of the evi-

dence that the release of a hazardous waste, hazardous constituent, or a hazardous substance was caused solely by:

. . .

. . .

(3) An act or omission of a third party other than an employee or agent of the person or other than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the person, if the person establishes by a preponderance of the evidence that:

(A) He had no relationship with the third party nor exercised any control over activities of the third party.

(B) He took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions; . . .

T.A. McCord contends that this provision is less restrictive—rather than more restrictive as argued by plaintiff—than CERCLA's third party defense. By McCord's interpretation the "relationship" referred to in section (c)(3)(A) must mean that a relationship exists over and above the contractual relationship. Under his argument an HSRA defendant logically would be entitled to the defense if the contractual relationship was the only relationship between the parties. In the court's view, however, the statute requires that in addition to establishing the lack of a contractual relationship in connection with the release of a hazardous waste, the party asserting the defense must also establish the lack of any other relationship between himself and the third party. Because T.A. McCord had a contractual relationship with PMI in connection with PMI's release of hazardous substances that precludes his reliance on the third party de-

---

claim. Plaintiff asserts that HSRA offers opportunities for recovery of cleanup costs that might be difficult to recover under CERCLA in that HSRA, unlike CERCLA, does not require consistency with the NCP. It is unclear what additional recovery plaintiff may be entitled to under HSRA; however, this issue will be saved for a later date.

**15.** McCord's argument is derived from an article about HSRA in the Mercer Law Review. *See* Robert D. Mowrey, *Georgia Goes Superfund: A Look at the New Georgia Hazardous Site Response Act*, 44 MERCER L.REV. 1, 14 (1985). The author comments that while such an interpretation would not be "beyond the pale," it would be "unfortunate as it might reduce a private party's incentive to undertake remedial work unless EPD requires the work." *Id.*

fense, it is not necessary to reach the question whether he had any other type of relationship that would also preclude use of the defense.

The court hereby adopts with respect to the HSRA claims the reasoning set out above in Paragraphs II.A.(1)(2)(3) and (4) with respect to the CERCLA claims. Plaintiff is entitled to summary judgment on the issue of the McCord defendants' liability under HSRA, although the extent of that liability and the amount of damages, if any, remain to be determined.

### B. Breach of contract

■ Finally, plaintiff has sued the McCord Trust and Concrete Sales for breach of the Phase I EPA agreement between Briggs & Stratton, the Trust, and Concrete Sales. The Trust and Concrete Sales assert that the first sentence of paragraph 8 of the agreement relieves them from liability to Briggs & Stratton because it contemplates no damages. That sentence reads: "This Agreement is not intended as, nor shall it be construed as, an allocation of liability or responsibility with respect to the Boy Scout Road property." However, it is clear that the purpose of such language was simply to preserve any other rights the parties may have to enforce the cleanup of the PMI site. Additional language in paragraph 8 specifically reserves to the parties all rights to assert claims against the parties to the agreement, including claims for breach of contract.

■ A valid contract under Georgia law requires "a subject matter, a consideration, and mutual assent by all parties to all terms." *See Dibrell Bros. Intern. S.A. v. Banca Nazionale Del Lavoro*, 38 F.3d 1571, 1582 (11th Cir.1994). The essential elements of a claim for breach of contract are a valid contract, a material breach of its terms, and damages. *TDS Healthcare Systems Corp. v. Humana Hosp. Illinois, Inc.*, 880 F.Supp. 1572, 1583 (N.D.Ga.1995). Construction of the contract is neither required nor permitted if the contract language is "plain, unambiguous and capable of only one reasonable interpretation." *Hunsinger v. Lockheed Corp.*, 192 Ga.App. 781, 783, 386 S.E.2d 537, 539 (1989).

■ The McCord Trust and Concrete Sales do not dispute that the Phase I contract was a valid contract. Further, the record clearly indicates that The Trust and Concrete Sales admit that they entered into the agreement with Briggs & Stratton and that they hired an environmental consultant to perform the work. Defendants admit that their consultant, Ensite, did not complete the work required under the agreement because they became delinquent in paying its invoices. At the time Ensite terminated its agreement with the Trust the work required under Section V.A. (Phase I) of the EPA order was incomplete, and defendants did not otherwise complete the work themselves or hire another consultant to complete it. Thus, the Trust and Concrete Sales breached their contract with Briggs & Stratton by failing to complete the portion of the work to which they agreed.

Finally, there is sufficient evidence that Briggs & Stratton incurred damages by defendants' breach. Briggs & Stratton performed the work it was required to do under the Phase I agreement and completed, at its own expense, work for which defendants were responsible. Consequently, the McCord Trust and Concrete Sales are liable to defendants under Georgia law for breach of the Phase I agreement.

### C. Motion of the Trustees to strike the affidavit of John Shiely

The Trustees have moved the court to strike the affidavit of John Shiely submitted on behalf of plaintiff with respect to the response costs incurred by plaintiff. The Trustees complain that Mr. Shiely's statements are not based on his own personal knowledge of all the invoices in possession of plaintiff for cleanup of the PMI site. There is adequate testimony in the record that plaintiff has incurred response costs in this case. The exact amount of the costs is not before the court at this time, and the court has not relied on Mr. Shiely's testimony as to the amounts of the invoices in determining defendants' liability. Hence, the Trustees' motion is denied as moot.

## V. *Conclusion*

For the reasons expressed above, and in summary:

(1) The motion for summary judgment of defendant T.A. McCord (Docket # 408) is **DENIED;**

(2) The motion for partial summary judgment as to liability filed by plaintiff Briggs & Stratton Corporation (Docket # 280)—

(a) is **GRANTED** as to plaintiff's Count I claims under CERCLA against T.A. McCord, the Trustees of the irrevocable trust of T.A. McCord, and Concrete Sales, Inc.; and **GRANTED** as to plaintiff's Count IX claim under CERCLA against Timothy McCord in his individual capacity;

(b) is **GRANTED** as to plaintiff's Count II claims under the Georgia Hazardous Site Response Act against T.A. McCord, the Trustees, and Concrete Sales, Inc.; and **GRANTED** as to plaintiff's Count X claim under CERCLA against Timothy McCord in his individual capacity;

(c) is **GRANTED** as to plaintiff's Count III claims for breach of contract against the Trustees and Concrete Sales, Inc;

(d) is **GRANTED** as to plaintiff's Count V citizen suit against T.A. McCord, the Trustees, and Concrete Sales, Inc., under the Resource Conservation and Recovery Act; and

(e) is **DENIED** as to plaintiff's Count VIII claim against Concrete Sales, Inc., and the Trustees, seeking to breach the corporate veil of Concrete Sales.

(3) the Trustees' motion to strike the affidavit of John Shiely (Docket # 423) is **DENIED** as moot.

**SO ORDERED.**