**CANADYNE–GEORGIA CORPORATION,**
Plaintiff,

v.

**BANK OF AMERICA, N.A.,**
**et al., Defendants.**

**Canadyne–Georgia Corporation,**
**Plaintiff,**

v.

**Jacqueline Woolfolk Mathes,**
**et al., Defendants.**

**Nos. 5:96–CV–114–1(DF),**
**5:99–CV–251–2(DF).**

United States District Court,
M.D. Georgia,
Macon Division.

July 31, 2001.

---

**1340**

Ligia Patricia Arias, Roger Allen Chalmers, John Clay Spinrad, Atlanta, GA, Walter H. Bush, Jr., Macon, GA, for plaintiff.

Michele L. Davis, Atlanta, GA, Hugh Brown McNatt, Vidalia, GA, Allen E. Lockerman, IV, David A. Sapp, Atlanta, GA, Mara McRae, Richard A. Horder, Valerie A. Nowell, W. Scott Laseter, Atlanta, GA, Douglas Sheppard Arnold, E. Peyton Nunez, Nill Toulme, Alston & Bird, Atlanta, GA, for defendants.

### ORDER

FITZPATRICK, District Judge.

This case is an action for declaratory and monetary relief pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C.A. § 9601 *et seq.* (West 1995 and Supp.2001); the Declaratory Judgment Act, 28 U.S.C.A. § 2201 *et seq.* (West 1994); the Georgia Hazardous Site Response Act ("HSRA"), O.C.G.A. § 12–8–90 (1996 and Supp.2000); and Georgia common law. This case is before the Court on Plaintiff's motions for partial summary judgment pursuant to Federal Rule of Civil Procedure 56 (tab # 171 in 5:96–CV–114–1(DF) and tab # 7 in 5:99–CV–251–2(DF)). Plaintiff seeks partial summary judgment against the following defendants in case number 5:96–CV–114–1(DF): Woolfolk Chemical Works, Ltd. III ("WCW, Ltd.III"), the J.W. Woolfolk Trust, and the Estate of Thomas W. Cleveland. In case number 5:99–CV–251–2 (DF), Plaintiff seeks partial summary judgment against the following defendants: Jacqueline Woolfolk Mathes; Rachel Mathes, individually and as trustee of the Anita Woolfolk Cleveland Trust; John W. Moye, individually and as trustee of the Elizabeth Woolfolk Moye Trust; the Jacqueline Woolfolk Mathes Trust; the Anita Woolfolk Cleveland Trust; Elizabeth Cleveland Martin; Anita Beauregard Cleveland; Blake Hansford Cleveland; Letitia M. Unver; Julia M. Poppell; Ann Cleveland Hoots; Deborah Cleveland; John C. Alden; and Betty L. Hewes. Plaintiff's motions for partial summary judgment address the liability of Defendants under § 113(f) of CERCLA[1] and

---

1. Plaintiff's complaints also seek relief under § 107 of CERCLA. Because Plaintiff is a

under § 5 of HSRA, and seek a declaratory judgment from the Court for Defendants' CERCLA and HSRA liability. Plaintiff reserves the question of damages for a later date.

## I. Facts

The facility at issue in this case, the Fort Valley, Georgia facility, has a history extending back approximately 80 years. The facility, which was used throughout its history to make pesticides, was originally founded as a sole proprietorship by Mr. J.W. Woolfolk. In 1925, the J.W. Woolfolk Company was incorporated, and it ran the facility until 1941. In 1941, the company dissolved and distributed all of its assets, including the facility real estate, to its shareholders, who included Mr. Woolfolk, his three daughters, and his wife. After the company's dissolution, a limited partnership, Woolfolk Chemical Works, Ltd. I, was formed. Mr. Woolfolk's daughters each owned an interest in WCW, Ltd. I. In 1942, the daughters placed their respective interests in WCW, Ltd. I into inter vivos trusts, which became irrevocable upon Mr. Woolfolk's death. In 1942, during the lifetime of WCW, Ltd. I, interest was transferred from Annie Woolfolk, Mr. Woolfolk's wife, to A.B. Young, Jr., W.C. McConnell, and W.D. Tharpe. The additional certificate of limited partnership showing this transfer was filed in the Clerk's Office of the Superior Court of Peach County in 1943.

Mr. Woolfolk died in 1945. His will appointed Elizabeth Woolfolk Moyes and Fulton National Bank as executors and trustees of the J.W. Woolfolk Trust. Following Mr. Woolfolk's death, the second Woolfolk limited partnership was formed. Partners in WCW, Ltd. II included the J.W. Woolfolk Trust and the three inter vivos trusts. In 1951, interest in WCW, Ltd. II was transferred from J.M. Taylor to William H. Taylor. A document conveying this transfer was filed in the Clerk's Office of the Superior Court of Peach County in 1955.

The third Woolfolk partnership was formed in 1957, following the retirement of one of the general partners, W.J. Lüpfert. Both John C. Alden and Betty L. Hewes were partners in WCW, Ltd. II and III. While WCW, Ltd. III operated the facility, it manufactured, formulated, distributed, and stored insecticides, fungicides, mixtures of insecticides and fungicides, herbicides, growth regulators, and other chemical products. The pesticides included organic pesticides, such as DDT, toxaphene, and lindane. WCW, Ltd. III, as well as WCW, Ltd. I and II, also produced arsenical pesticides. Lindane, toxaphene, arsenic, and DDT are all listed as hazardous substances, as defined by CERCLA.

In 1972, WCW, Ltd. III was incorporated and as part of this incorporation, it sold its assets to Woolfolk Corporation. Five years later, in 1977, Woolfolk Corporation was purchased by R.L. Holdings, Inc. and renamed Canadyne Corporation. In 1984, Canadyne Corporation was renamed Canadyne–Georgia Corporation.

The inter vivos trusts and the J.W. Woolfolk Trust earned profits in the form of partnership distributions arising out of their ownership interests in WCW Ltd. I, II, and III. These profits were distributed to the trusts' beneficiaries. Upon the sale of the stock of Woolfolk Corporation in 1977, a portion of the proceeds from the sale went into the J.W. Woolfolk Trust and the inter vivos trusts. In the years since the sale of Woolfolk Corporation, the beneficiaries of the J.W. Woolfolk Trust and

responsible party under § 107, however, to the extent that Plaintiff may recover, its claim is one for contribution under § 113(f). *See*

*Canadyne–Georgia Corp. v. Cleveland, et al.,* 72 F.Supp.2d 1373, 1377 (M.D.Ga.1999).

the inter vivos trusts received income derived from the investments made with the sale money. The beneficiaries of the J.W. Woolfolk Trust include Jacqueline Woolfolk Mathes, Rachel Mathes, Thomas W. Cleveland, Sr. (represented by his estate and executors), Thomas W. Cleveland, Jr., John W. Moye, Letitia M. Unver, Julia M. Poppell, Ann Cleveland Hoots, and Deborah Cleveland. The known beneficiaries of the inter vivos trusts include Jacqueline Woolfolk Mathes (the "Mathes Trust"); Thomas W. Cleveland, Sr. (represented by his estate and executors), Thomas W. Cleveland, Jr., Elizabeth Cleveland Martin, Anita Beauregard Cleveland, Blake Hansford Cleveland (the "Cleveland Trust"); and Letitia M. Unver, Julia M. Poppell and John W. Moye (the "Moye Trust").

On August 30, 1990, the United States Environmental Protection Agency (EPA) placed the facility and other affected property located near the facility on the National Priorities List. Between 1990 and 1995, the EPA issued several orders commanding Canadyne–Georgia to address contamination at its facility in Fort Valley. In this suit, Canadyne–Georgia seeks to recover some of the costs of this cleanup operation from other potentially responsible parties.

## II. Summary Judgment Standard

Summary judgment is appropriate when "there is no genuine issue as to any material fact ... and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Edwards v. Shalala*, 64 F.3d 601, 603 (11th Cir.1995). If the moving party demonstrates that there is "an absence of evidence to support the non-moving party's case," the burden shifts to the non-moving party to go beyond the pleadings and present specific evidence giving rise to a triable issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986);

*Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991).

In reviewing a motion for summary judgment, the court must construe the evidence and all inferences drawn from the evidence in the light most favorable to the non-moving party. *See Maynard v. Williams*, 72 F.3d 848, 851 (11th Cir.1996). Even if there exists some alleged factual dispute between the parties, summary judgment is not necessarily improper; there must be a genuine issue of material fact to render summary judgment improper. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## III. Legal Analysis

### A. Admissibility of Exhibits

The Court will first address the admissibility of various exhibits submitted by Plaintiff. Defendants filed a motion to strike, asking the Court to strike exhibits 1, 2, 3, 5, 6, 7, 8, 9, 13, 18, 19, 21, 26, 27, 28, and 29 attached to Plaintiff's motions for partial summary judgment. Although the Court denied the motion to strike on procedural grounds, the Court stated that it would consider the admissibility of the exhibits when it addressed the motions for summary judgment. Defendants argue that the exhibits should be stricken because they were not certified or otherwise authenticated as required by Rule 56(e) of the Federal Rules of Civil Procedure. In response to Defendants' motion, Plaintiff certified exhibits 5–8, noted that exhibit 9 was already certified, and stated that certain of the other exhibits were either admissible via other means or superfluous, as the facts that they supported were uncontested or could be proven by other exhibits.

Rule 56 does not specifically list documents as evidence that the Court may

consider in summary judgment motions. The Court notes, however, that although documents are not specified in Rule 56, several authorities have agreed that a court may consider any evidence admissible at trial. *See, e.g., Catrett v. Johns–Manville Sales Corp.*, 826 F.2d 33, 37 (D.C.Cir.1987) (citing 10 A Charles Alan Wright, Arthur R. Miller and Mary Kay Kane, *Federal Practice & Procedure* § 2721 (2d ed.1983), for the proposition that "a court may consider materials specified in Federal Rule of Civil Procedure 56(c) as well as 'any material that would be admissible or usable at trial.' "); *Martz v. Union Labor Life Ins. Co.*, 757 F.2d 135, 138 (7th Cir.1985) ("The facts must be established through one of the vehicles designed to ensure reliability and veracity-depositions, answers to interrogatories, admissions and affidavits. When a party seeks to offer evidence through other exhibits, they must be identified by affidavit or otherwise made admissible in evidence."); *Munoz v. Int'l Alliance of Theatrical Stage Employees & Moving Picture Mach. Operators of U.S. & Can.*, 563 F.2d 205, 207 (5th Cir.1977) (noting that court may consider "pleadings, affidavits, depositions, motions, answers to interrogatories, stipulations, and other material properly before it"); [2] *Olympic Ins. Co. v. H.D. Harrison, Inc.*, 418 F.2d 669, 670 (5th Cir.1969) (finding computer printouts to be admissible as they were produced in the ordinary course of business and have a prima facie aura of reliability);10A Charles Alan Wright, et al., *Federal Practice & Procedure* § 2721, at 361 (3d ed. 1998) ([T]he particular forms of evidence mentioned in the rule [rule 56] are not the exclusive means of presenting evidence on a Rule 56 motion. The Court may consider any material that would be admissible

or usable at trial.). Accordingly, the Court will determine whether each challenged exhibit is one that has been certified or is otherwise admissible at trial.

As to those exhibits that were certified, including exhibits 5–9, the Court finds that they would be admissible at trial. With respect to hearsay concerns, exhibit 9 falls within a hearsay exception, Rule 803(16), as it is an ancient document over twenty years of age that has been authenticated. In addition, exhibits 5–8 would be admissible at trial under another hearsay exception, Rule 803(8), and would be self-authenticating under Rule 902(4), as they are certified copies of public records. The Court also notes that they have been properly authenticated by Deborah H. Jourdan, Superfund Records Management Coordinator of the EPA.

■ With respect to exhibit 1; which contains various forms of correspondence between the State Water Quality Control Board and John H. Thurman, a former employee of WCW, Ltd. II and III, and Woolfolk Chemical Works, Inc.; and exhibit 3; an engineering report prepared by Patchen, Mingledorff & Associates ( "Patchen, Mingledorff Report"); the Court notes that in Thurman's deposition he identified those letters authored by himself as well as the Patchen, Mingledorff Report. Although Defendants contend that Thurman's affidavit negates his identification of the report and of the letters authored by him, the Court does not agree. Thurman's affidavit states, "In particular, I was presented with various letters, most of which I did not recall. I was also presented with a copy of an engineering report prepared in April, 1971 by Patchen, Mingledorff & Associates, and asked questions regarding certain selected excerpts

---

**2.** The Eleventh Circuit has adopted as binding precedent all decisions issued by the Former Fifth Circuit prior to October 1, 1981. *See*

*Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

from the report. At the time of the deposition, I had only a very general recollection of the report...." The Court finds that these statements do not contradict his earlier identification of the documents. The Court finds that the letters authored by Thurman and the Patchen, Mingledorff Report have been sufficiently identified and would be admissible at trial under the hearsay exception in Rule 803(16) and the authentication provisions in Rules 901(b)(8) or 901(b)(1). Exhibit 1 also contains an internal memorandum from the State Water Quality Control Board. The memorandum has not been identified, nor has Plaintiff attempted to explain its admissibility. This fact, in addition to the fact that the Court does not find the memorandum to be relevant to the issue of a release of a hazardous substance, leads the Court to exclude the memorandum from its consideration of the evidence. Finally, exhibit 1 contains letters from the State Water Quality Control Board to Thurman, in his capacity as plant manager. The Court will consider the letter dated March 16, 1971, as Thurman admitted in his deposition that he generally recalled receiving letters from the State Water Quality Control Board and stated that his letter dated May 12, 1971, was a response to the March 16, 1971 letter. In addition, under Rule 803(16) and under Rule 901(b)(1) this letter would be admissible at trial. With respect to the February 4, 1971 letter, however, Thurman testified that he did not recall receiving it. Because there was no further testimony identifying the letter, the Court will not consider it.

Defendants also object to exhibit 2. Exhibit 2 is a handwritten letter from a student referring to a heavily polluted ditch in Fort Valley. As it stands, the Court does not find that this letter is relevant to the issue of hazardous releases, as there is no mention of any specific pollutant, nor is there a description of the location of the ditch. Accordingly, the Court will not con-

sider exhibit 2. As to exhibit 19, the Court notes that the exhibit was previously submitted by Defendant WCW, Ltd. through the affidavit of John Alden. The Court finds it ironic that Defendants protest the authenticity of a document that they themselves submitted; however, because the fact that exhibit 19 supports is uncontested, the Court need not address the admissibility of the document. Finally, the Court will not consider the remaining uncertified exhibits, as there is no proof of their authenticity. Thus, exhibits 13, 18, 21, and 26–29 are excluded.

## B. Comprehensive Environmental Response, Compensation, and Liability Act

Plaintiff seeks contribution from Defendants in both of the above captioned cases. Under 42 U.S.C.A. § 9613(f)(1), "any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title." In order to succeed on a contribution claim under CERCLA, a plaintiff must show the following:

1. the site in question is a "facility" as defined in § 101(9) of CERCLA, 42 U.S.C. 9601(9);

2. a release or threatened release of a hazardous substance has occurred;

3. the release or threatened release has caused the plaintiff to incur response costs consistent with the 'national contingency plan' (NCP); and

4. the defendant is a 'covered person' under § 107(a) of CERCLA.

*Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496–97 (11th Cir. 1996).

### 1. Facility

■ A facility is defined as a "site or area where a hazardous substance has been deposited, stored, disposed of, or

placed, or otherwise come to be located." 42 U.S.C.A. § 9601(9)(B). Thurman's deposition and letters, as well as the Patchen, Mingledorff Report, reveal that several items classified as "hazardous substances" under § 101(14) of CERCLA were stored on the site. In particular, the Court notes that the Patchen, Mingledorff Report, Thurman's deposition, and Thurman's August 23, 1971 letter all refer to a tank containing liquid toxaphene, a hazardous substance under CERCLA. In addition, the Patchen, Mingledorff Report and Thurman's deposition make reference to the storage of arsenic trioxide, which is a hazardous substance under CERCLA. Also, the EPA administrative orders note that contaminants found at the site include arsenic, dioxin, DDT, chlordane, lead, lindane, and toxaphene, all of which are "hazardous substances" as defined by § 101(14) of CERCLA. Moreover, the EPA unilateral administrative order for removal response activities draws the conclusion that the site is a facility as defined by § 101(9) of CERCLA.[3] Based on the above evidence and the lack of contrary assertions by Defendants, the Court finds that the site is a facility both because "hazardous substances" have been stored at the site and because "hazardous substances" have come to be located at the site. *See Northwestern Mut. Life Ins. Co. v. Atlantic Research Corp.*, 847 F.Supp. 389, 396 (E.D.Va.1994) (noting that entire site is a "facility" as hazardous substances were found throughout property and therefore have "come to be located" on land).

**2. Release**

Several Defendants focus the strength of their response in opposition to Plaintiff's motions for partial summary judgment on the requirement that Plaintiff prove there was a release of a hazardous substance. Defendants argue that Plaintiff's exhibits do not support Plaintiff's contention that there was a release of a hazardous substance. In support of their argument, Defendants attach an affidavit from Thurman with statements allegedly clarifying his deposition. Plaintiff responds that it has presented sufficient evidence of a release of a hazardous substance and also notes that during oral arguments on prior summary judgment motions, Defendants conceded that discharges occurred during the time that WCW, Ltd. owned the facility.

CERCLA defines "release" to include "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment." 42 U.S.C.A. § 9601(22). Hazardous substance is defined as

(A) any substance designated pursuant to section 1321(b)(2)(A) of Title 33, (B) any element, compound, mixture, solution, or substance designated pursuant to section 9602 of this title, (C) any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act ... (D) any toxic pollutant listed under section 1317(a) of Title 33, (E) any hazardous air pollutant listed under section 112 of the Clean Air Act ... and (F) any imminently hazardous

---

**3.** The Court notes that an EPA order issued pursuant to 42 U.S.C.A. § 106(a) is not binding on the Court. Rather, such an order represents action by the EPA "in its role as prosecutor in enforcing a federal environmental statute." *Redwing Carriers, Inc.*, 94 F.3d at 1507 n. 24. According to the Eleventh Circuit, "any findings made in such orders are therefore not entitled to deference under

the reasoning of *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)...." *Id.* Furthermore, the district and circuit courts are not obliged to defer to the agency's conclusions, as such "findings are merely the agency's conclusions regarding who is liable under CERCLA given the facts of a particular case." *Id.*

chemical substance or mixture with respect to which the Administrator has taken action pursuant to section 2606 of Title 15.

42 U.S.C.A. § 9601(14). In defining "hazardous substance," CERCLA does not refer to any quantitative amount and courts have accordingly noted that the definition of "hazardous substance" includes any minimal amounts. *See, e.g., B.F. Goodrich v. Betkoski,* 99 F.3d 505, 517 (2nd Cir. 1996); *Amoco Oil Co. v. Borden, Inc.,* 889 F.2d 664, 669 (5th Cir.1989). Further, CERCLA is a strict liability statute, and no showing of causation is needed to establish liability. *Canadyne–Georgia Corp. v. NationsBank, N.A. (South),* 183 F.3d 1269, 1275 (11th Cir.1999); *Goodrich,* 99 F.3d at 517. Finally, the term "release" should be construed broadly in order to fulfill the goals of CERCLA. *See Nurad, Inc. v. Wm. E. Hooper & Sons, Co.,* 22 Env't L. Rep. 20079, 20081 (D.Md.1991) (noting that "release" is to be construed broadly and providing string cite to cases so construing "release"), *aff'd in part, rev'd in part on other grounds,* 966 F.2d 837 (4th Cir.1992).

■ The Court finds that the evidence presented by Plaintiff is sufficient to establish a release of a hazardous substance prior to 1972. Primarily, the Court notes that Plaintiff has introduced evidence establishing the release of hazardous substances via the drum washing operation in effect at WCW, Ltd. prior to May, 1971. Plaintiff's evidence establishes that although drum washing primarily consisted of washing out drums containing a lime-sulphur solution, drum washing also occasionally included drums containing chlori-nated hydrocarbons and organic phosphates.[4] Specifically, in a letter from Thurman dated November 24, 1971, Thurman discussed the now defunct drum washing operation and summarized plans for drums containing parathion and chlorinated hydrocarbons. Also, in his deposition, Thurman stated that he recalled organic phosphates being involved in the drum washing process. In addition, the Patchen, Mingledorff Report notes that "occasionally drums are washed which last contained technical grades of the organic phosphates or chlorinated hydrocarbons." (Pl. ex. 3 at IV.A.2.a.) The report later defines organic phosphates as being "basically Parathion, Methyl Parathion, Malathion," and chlorinated hydrocarbons as being "4-2-1 (combination of D.D.T., Methyl Parathion and Toxaphene), Toxaphene, Dieldrin, Endrin, Aldrin, and Benzine hexachloride." (*Id.* at VI.) Both the Patchen, Mingledorff Report and Thurman's deposition testimony establish that the drum washing operation was discharging hazardous substances into the nearby drainage ditch. Thurman also testified in his deposition that the drums containing organophosphates were washed at the same location in which the drums containing a lime-sulfur solution were washed. In addition, the Court notes that in the EPA orders, the EPA determined that the contamination of the soil and groundwater at the site was due in part to "inadequate safeguards against spills and leaks from drum washing operations." (Pl. ex. 7 at 9.) Because the drum washing ceased in May 1971, the releases of hazardous substances that resulted from this operation took place during the time period relevant to establishing liability.[5]

---

**4.** The organophosphates and chlorinated hydrocarbons mentioned by Thurman and the report are hazardous substances under CERCLA. *See* 40 C.F.R. § 302.4 (2000).

**5.** The liability of some of the defendants turns on more specific time periods. For those defendants, the Court will address the question of hazardous deposits more specifically while discussing their status as "covered persons" within CERCLA.

In response to this evidence, Defendants have submitted an affidavit from Thurman. In his affidavit, Thurman states,

> While I recalled a few drums containing chlordane residue' were triple rinsed, these drums would have been washed in a different area, away from the drainage ditch, utilizing a different process whereby a solvent would be used to wash the drum and then saved for the next production batch. Thus, other than the lime sulfur wash water, I do not recall any chemicals being discharged to drainage ditch.

(Thurman Aff. at ¶ 4). To the extent this testimony is referring to drums containing organophosphates, it directly contradicts Thurman's deposition testimony, in which he recalled that drums containing organophosphates were washed in the same place as those containing lime sulfur. In a discussion regarding drums containing organophosphates, Thurman testified as follows:

Q  And then what was done to them after that at the plant?

A  They were emptied and rinsed into the product that was being made. And then they were, at one time they were taken up and washed at this drum washing operation.

Q  The same place where the lime sulfur drums—

A  Yes

Q—were washed?

A  Uh-huh (affirmatively).

Q  Is that correct?

A  Yes.

(Thurman Dep. at 74–75.) The affidavit testimony also contradicts Thurman's deposition testimony confirming the Patchen, Mingledorff report's statement that both technical grades of organophosphates and chlordane were washed in the drum washing operation. Thurman offers no explanation for his inconsistent testimony. Because the Court finds that this portion of the affidavit testimony directly contradicts, without explanation, Thurman's earlier deposition testimony, the Court will disregard the affidavit.[6] *Lane v. Celotex*, 782 F.2d 1526, 1533 (11th Cir.1986) (noting that courts may disregard "affidavits that 'contradict, without explanation, previously given clear testimony' "). In addition, Thurman's affidavit states that he "cannot confirm that any chemicals, other than the lime sulfur wash water" were discharged into the ditch. (Thurman Aff. at ¶ 5.) This statement is consistent with Thurman's deposition testimony, in which he had agreed that wash water was discharged to a nearby drainage ditch, but would not confirm that this wash water included toxic materials, as he felt that the report was jumping to conclusions. Because the Court finds that the uncontradicted evidence showing that drums containing hazardous substances were washed in an area in which the wash water was discharged into a nearby drainage ditch is sufficient to establish a release, the Court does not need a confirmation from Thurman that the wash water was contaminated by toxic chemicals. Accordingly, this statement in Thurman's affidavit does not affect the Court's determination, nor does it create a factual dispute regarding releases from the washwater, as Thurman is not actually disputing whether there was a discharge, but is merely unwilling to make any confirmations. Based on Thurman's deposition and letters, the Patchen, Mingledorff Report, and the EPA findings, and in the absence of any admissible evidence to the contrary presented by Defendants, the Court finds that there is sufficient evidence to estab-

**6.** The Court notes that Thurman's affidavit seems to be describing a process for cleaning the drums that was adopted by WCW after it ceased the drum washing operation. (Thurman Dep. at 113–15.)

lish a release of a hazardous substance resulting from the drum washing operation.

■ In addition to drum washing, the Patchen, Mingledorff Report notes problems with arsenic trioxide and arsenic acid, both of which are listed as CERCLA hazardous substances. Specifically, the report notes that "[a]rsenic trioxide is stored in a hopper at the rail siding from which it is transferred by screw conveyor to the acid plant. The access shed does not provide adequate weather protection and allows the powder to be washed onto the siding where it is carried off with storm water run-off." (Pl. ex. 3 at IV.B.1.a.) Also, with respect to arsenic acid, the report states that "[t]he reactor is installed under an open shed on a slab without curbs. Sometimes the reaction of the arsenic trioxide with nitric acid boils over. The boil over now goes directly into the storm drainage ditch." (*Id.* at IV.B.2.a.) When asked about the above statements, Thurman was unable to confirm the first observation, but did confirm the second statement as follows:

Q The report goes on to state that sometimes the reaction of the arsenic trioxide with nitric acid boils over. Do you recall that happening?

A I recall that it happened, yes.

Q And Patchen Mingledorff says the boil over now goes directly into the storm drainage ditch. Is that where you remember the boil over would go?

A Yes, I guess it would, yes.

(Thurman Dep. at 117). In addition, Thurman was asked whether there were accidental overflows from the arsenic acid reactor and he replied, "I think there were, yes." (Thurman Dep. at 91). Defendants counter this evidence with Thurman's affidavit, which states as follows:

These overflows [from the arsenic acid reactor] were rare and the Company's response was to immediately neutralize the overflow with lime and clean the area of the spill. I was asked about arsenic acid boil over and whether it would go into an adjacent storm drainage ditch. In response, I guessed it would. I was simply following the language of the observation contained in the report. Thus, I have no specific recollection that any arsenic acid boil over actually discharged into the ditch.

(Thurman Aff. ¶ 3.) With respect to the overflow from the arsenic acid reactor, the Court believes that Thurman's affidavit regarding the neutralization of the arsenic acid creates an issue of fact as to whether there was a release of that substance. In his affidavit, Thurman is not contradicting prior testimony; he is merely providing the additional information that the hazardous substance was neutralized after any spills. Without knowing whether the material was neutralized while still on the concrete and before reaching the ground, the Court does not believe there is sufficient evidence of a release. As to the storage of arsenic trioxide, even though Thurman does not independently recall the releases resulting from that storage, the Court finds that the report sufficiently establishes that there were releases of arsenic trioxide.

In addition, the Court notes that the EPA administrative orders found that the soil and groundwater at the site were contaminated and that the contamination was "determined to be a result of inadequate safeguards against spills and leaks from drum washing operations and other pesticide and herbicide handling activities over the years." (Pl. ex. 7 at 9.) The EPA order further found that "[p]rincipal contaminants at the Site are arsenic, DDT, chlordane, lead, lindane and toxaphene." (*Id.*) This evidence is noteworthy in conjunction with the other evidence, particularly because the drum washing operations

ceased in 1971 and DDT was banned in 1972. *See* 37 Fed.Reg. 13369 (July 7, 1972); *see also Nurad,* 22 Envtl. L. Rep. at 20081 (noting that evidence of hazardous substances in soil supports finding of release); *United States v. Hardage,* 761 F.Supp. 1501, 1510 (W.D.Okl.1990) (finding that "[p]resence of hazardous substances in the soil, surface water or ground water of a site demonstrates a release" under CERCLA).[7] In conclusion, the Court finds that the evidence of discharges from the drum washing operation and the arsenic trioxide storage, as well as the evidence of hazardous substances in the soil, sufficiently establishes a release of a hazardous substance into the environment.

### 3. Response Costs Consistent with the National Contingency Plan

A third requirement that Plaintiff must show in order to prevail on a CERCLA claim under § 113(f) is that the "release" of a hazardous substance caused the plaintiff to incur response costs consistent with the NCP. *Redwing Carriers,* 94 F.3d at 1496.[8] As noted in *Redwing Carriers,* "[t]he NCP is a body of regulations governing the clean up of hazardous waste sites under CERCLA." *Id.* In support of its argument that it has incurred necessary response costs consistent with the NCP, Plaintiff cites the affidavit of Michael Kowalski, president of Canadyne–Georgia Corp., affirming that Plaintiff spent more than $23 million responding to the EPA orders issued pursuant to § 106

and § 122 of CERCLA. Defendants do not respond to Plaintiff's assertions.

The Code of Federal Regulations notes that "[a]ny response action carried out in compliance with the terms of an order issued by EPA pursuant to section 106 of CERCLA, or a consent decree entered into pursuant to section 122 of CERCLA, will be considered 'consistent with the NCP.'" 40 C.F.R. § 300.700(c)(3)(ii) (2000). *See also Bancamerica Commercial Corp. v. Mosher Steel of Kan., Inc.,* 100 F.3d 792, 796–97 (10th Cir.1996) (citing and applying 40 C.R.F. § 300.700(c)(3)(ii) to find that plaintiffs' response costs were consistent with the NCP). Kowalski's affidavit states that "Canadyne–Georgia has complied with EPA's orders and directives," and in doing so has expended over $23 million. (Kowalski Aff. ¶ 4.) Based on this evidence and on the presumption of consistency afforded to parties complying with EPA orders and consent decrees, as well as the lack of any contrary evidence presented by Defendants, the Court finds that Plaintiff has satisfied the requirement that the hazardous release caused it to incur response costs consistent with the NCP.

### 4. Covered Persons

The fourth requirement that a plaintiff must meet to establish liability in a CERCLA contribution action is that the defendants be "covered persons" under § 107(a) of CERCLA. Although there are four classes of covered persons under § 107(a), the relevant class for purposes of

---

7. The Court notes that its previous order, which addressed summary judgment motions filed by WCW, Ltd. and the J.W. Woolfolk Trust, referenced the following limited concession: "While defendants dispute the nature and quantity of the pollution they are allegedly responsible for, they conceded in oral argument that some discharges were made during the time in which WCW owned the facility." *Canadyne–Georgia Corp.,* 72 F.Supp.2d at 1376–77.

8. In *Redwing Carriers,* the Eleventh Circuit noted that there is a split of authority on whether a CERCLA plaintiff must prove consistency as part of its prima facie case for liability or whether consistency is a limit on the amount of recovery available. 94 F.3d at 1497 n. 8. Because this is not an issue in this case, the Court need not address this split.

this lawsuit is identified in § 107(a)(2), which defines a potentially responsible party as "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." 42 U.S.C.A. § 9607(a)(2). CERCLA defines "disposal" as "the discharge, deposit, injection, dumping, spilling, leaking or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C.A § 6903(3) (incorporated at 42 U.S.C.A. § 9601(29)).

### a. WCW, Ltd. III

Plaintiff claims that WCW, Ltd. III is covered under § 107(a)(2) as an operator of the Woolfolk facility.[9] Defendants admit that WCW, Ltd. III operated the Woolfolk facility from 1957 until 1972, but claim that there is no proof that any hazardous substance was disposed of during those years.[10] Defendants claim that Thurman's correspondence with the State Water Quality Control Board makes no mention of any hazardous substance. However, in discussing its now-ceased drum washing operation, Thurman's November 24, 1971, letter to the State Water Quality Control Board discusses WCW, Ltd. III's future plans for several identified drums, including ones that previously contained parathion and chlorinated hydro-

carbons. While inconclusive in and of itself, the Court believes that this letter, in conjunction with the other evidence, supports the conclusion that such drums were previously washed in the drum washing operation. In addition, Defendants argue that the Patchen, Mingledorff Report only mentions the possibility of a release. The Court believes that the report does more than that. The Patchen, Mingledorff Report notes that the wash water from the drum washing operation was discharged to a nearby drainage ditch. · In addition, the report notes that "occasionally drums are washed which last contained technical grades of the organic phosphates or chlorinated hydrocarbons." (Pl. ex. 3 at IV. A. 2. a.) In addition, the Court notes that Defendants have not put forth any admissible contradictory evidence. Although Defendants did submit an affidavit from Thurman, the Court has already discussed the fact that it is striking a portion of that affidavit, as Thurman's statement regarding drum washing directly contradicted, without explanation, his previous deposition testimony. Moreover, Thurman's other affidavit statements concerning the drum washing were inconclusive with respect to any discharges.

■  The Court finds that Plaintiff has put forth sufficient evidence to show that there has been a disposal of hazardous substances while WCW, Ltd. III operated the facility. The Court discussed the evidence showing a release of hazardous sub-

---

**9.** In a previous order, the Court addressed the WCW's argument that it was not a "person" within the meaning of CERCLA, as it was a "dead and buried" partnership. *Canadyne-Georgia Corp.*, 72 F.Supp.2d at 1384. In that order, the Court concluded that even if WCW were a "dead and buried" partnership, it would still be a "person" within the meaning of CERCLA. *Id.* at 1384.

**10.** In its complaint, WCW also asserts that "two prior independent partnerships" (WCW,

Ltd. I and WCW, Ltd. II) operated the facility from 1941 to 1957. Although Plaintiff's complaints suggest that it considers the three partnerships to be essentially one entity, Plaintiff does not attempt to argue this in its motion for summary judgment or to hold WCW, Ltd. III liable for the full period of time from 1941 to 1972. Accordingly, the Court will not address this possibility and will adopt the time frames argued by both parties.

stances in the previous section. Here, the Court emphasizes that it finds the evidence concerning the drum washing operation particularly persuasive with respect to pinpointing a disposal of a hazardous substance during the relevant time period. As noted above, Thurman's deposition testimony and the Patchen, Mingledorff Report show that the drum washing operation at one time included drums containing organophosphates, which were washed in the same place as the drums containing lime sulfur solution. With respect to the timing of the disposal, the Court is willing to make the reasonable inference that because the Patchen, Mingledorff report was prepared in 1971 and 1972 in response to a request by WCW, Ltd. III to help it with pollution abatement, the report refers to events that took place during that time period or in the immediate vicinity.[11] The Court believes that the correspondence between Thurman and the State Water Quality Control Board also refers to operations that took place in the time period proximate to the writing of the letters. In addition, the drum washing procedures ceased in 1971, so any of the disposals resulting from this process must have occurred before that time period. Based on the letters, the Patchen, Mingledorff Report, and Thurman's deposition testimony, and making the reasonable inference that these events occurred proximate to 1971, and based on the fact that Defendants have presented no evidence contradicting Plaintiff's evidence or suggesting that the operations described therein referred exclusively to other time periods, the Court finds that Plaintiff has satisfied its burden of showing that there were disposals of hazardous material during the time period

that WCW, Ltd. III operated the facility.[12] Accordingly, WCW, Ltd. III is a "covered person" within the meaning of CERCLA and Plaintiff has satisfied its prima facie burden of showing that WCW, Ltd. III is liable under CERCLA.

### b. Woolfolk Trust

Plaintiff argues that the Woolfolk Trust is a "covered person" on alternate theories. First, Plaintiff claims that the Woolfolk Trust is an owner of the property, holding title either through its receipt of title from Mr. Woolfolk via the Woolfolk Trust or as a general partner in WCW, Ltd. II and III. Alternatively, Plaintiff argues that the Woolfolk Trust is liable as a general partner based on Georgia partnership law.

As to Plaintiff's first theory of liability, the basis for determining the Woolfolk Trust's status as an owner turns on the Court's interpretation of an indenture executed and recorded in 1973, but purporting to convey the facility title from the former J.W. Woolfolk Company shareholders to WCW, Ltd. I in 1941. In order to do so, the Court must decide the effective date for the transfer of title of the facility land to WCW, Ltd. As noted in Plaintiff's statement of undisputed material facts, both parties agree that "[i]n 1941, the J.W. Woolfolk Company distributed all of its assets, including ownership of the Facility real estate, to its shareholders, including Mr. Woolfolk, along with several other individuals." (Pl.'s Stmt. Undisputed Material Facts, at ¶ 10.) Defendants dispute, however, Plaintiff's statement that "[t]itle to the Woolfolk real estate was not conveyed from the individuals to the Woolfolk

---

**11.** In his deposition, Thurman testified that the Patchen, Mingledorff Report was a result of WCW, Ltd.III's work with Patchen, Mingledorff & Associates to address pollution abatement.

**12.** The Court notes that in order to find that disposal of a hazardous substance took place, there is no requirement of any minimum threshold level or quantity. *See United States v. CDMG Realty Co.,* 96 F.3d 706, 711 (3d Cir.1996).

Partnership until 1973." (*Id.* at ¶ 11.) Defendants argue that title was conveyed from the individuals to WCW, Ltd. I in 1941.

▮▮▮ The indenture states that it was made and entered into on June 29, 1941. The indenture itself, however, was signed and recorded in 1973. The majority of individuals who received ownership of the property in 1941 were deceased in 1973 and their executors or executrixes signed the indenture for them. In addition, the Court notes that the description of the property includes references to property conveyed as of May 11, 1967. The Court must apply Georgia law to determine the validity of this indenture. Georgia law provides that "when writings or contacts are intended to have effect in this state they must be executed in conformity to the laws of this state." O.C.G.A. § 1–3–10 (2000). Here, the writing at issue is an indenture and under Georgia law an indenture is treated as a deed. *See Milner v. Bivens*, 255 Ga. 49, 335 S.E.2d 288, 290 (1985). Accordingly, the Court must determine whether the requirements for a deed have been met. Georgia law provides that "[a] deed to lands must be in writing, signed by the maker, and attested by at least two witnesses. It must be delivered to the purchaser or his representative and be made on a good or valuable consideration." O.C.G.A. § 44–5–30 (1991). Thus, execution and delivery were needed in order for the indenture to have validly passed title to the real property from the individuals to the WCW, Ltd. The execution of this indenture took place in January and February of 1973. Although Defendants dispute Plaintiff's assertion that title transfer did not take place until 1973, Defendants have not introduced any evidence or made any arguments in support of their position. Accordingly, the Court finds that the deed transferring title to the facility real estate was not effective until 1973 and that prior to that time peri-

od, the individuals who received title in 1941 continued to hold that title. Based on this determination, the Court finds that the Woolfolk Trust held J.W. Woolfolk's interest in the title to the facility. Thus, the Woolfolk Trust was an owner of the property from 1945 to 1973.

For the Woolfolk Trust to be a "covered person," Plaintiff must also establish that a disposal of hazardous substances took place during the time that the Woolfolk Trust owned the property. The relevant time period includes the time period discussed in the previous section as to WCW, Ltd. III. Accordingly, the Court's previous conclusion that a disposal took place between 1957 and 1972 applies here as well. Based on these conclusions, the Court finds that the Woolfolk Trust was a "covered person" within the meaning of § 107(a)(2) of CERCLA. *See Briggs & Stratton Corp. v. Concrete Sales & Serv.*, 20 F.Supp.2d 1356, 1367 (M.D.Ga.1998) (finding that trust is liable as a former owner under CERCLA and can be held liable to extent of assets in trust).

▮▮ Plaintiff also argues that the Woolfolk Trust is vicariously or indirectly liable under CERCLA because of its status as a general partner in WCW, Ltd. III. Plaintiff states that in 1945, upon Mr. Woolfolk's death, a trust was created that included Mr. Woolfolk's general partnership interest in WCW, Ltd. Defendant disputes this statement and argues that the exhibit supporting the statement, Mr. Woolfolk's will, is uncertified and that therefore the Court may not consider it. As previously discussed, however, the Court finds that the will is certified and should be considered as evidence. The Court has reviewed the will and has determined that while Mr. Woolfolk referenced his general partnership in WCW, Ltd. I, and expressed his desire that the executors and/or trustees continue to be in-

volved in WCW, Ltd., he did not specifically make the Woolfolk Trust a general partner in the will. Thus, the Court does not believe this evidence is sufficient in and of itself to establish that the Woolfolk Trust was a general partner in the WCW, Ltd. II and III. Plaintiff also states that as of 1945, the Woolfolk Trust was a general partner in the WCW, Ltd. Defendants dispute this statement; they admit that the Woolfolk Trust was a partner in WCW, Ltd., but assert that it was a partner "in name only" and did not participate in the operations of the business. Defendants have cited no authority for the significance of being a partner "in name only" or to support their implication that this would prevent such a partner from being jointly and severally liable, nor have they provided any evidence to support these assertions. Thus, the Court does not consider this argument meritorious.

In addition to the limited admission made by Defendants, the Court notes that several exhibits support Plaintiff's assertion that the Woolfolk Trust was a general partner. For example, exhibits 10, 11, and 12, which include the certificate of limited partnership for WCW, Ltd. II; the supplementary articles of limited partnership for WCW, Ltd. II (noting that executors of Mr. Woolfolk's will became partners in Mr. Woolfolk's place); and the partnership agreement for WCW, Ltd. III-the formation papers for WCW. Ltd. III; all identify the Woolfolk Trust as a general partner in the respective partnerships.[13] Although

Defendants had the opportunity to present evidence showing a genuine issue of material fact as to the Woolfolk Trust's status as a general partner, Defendants have not done so. Accordingly, based on the above evidence, and the lack of evidence put forth by Defendants, the Court finds that the Woolfolk Trust was a general partner in WCW, Ltd. II and III.[14]

General partners can be held vicariously or indirectly liable under CERCLA; this liability is based on "their relationship to the owners [or operators] of the land." *Canadyne–Georgia Corp.*, 183 F.3d at 1275 (noting, as an example, that "if a partnership were directly liable as an owner of land, then the general partners in that partnership might be indirectly liable."); *see also Redwing Carriers,* 94 F.3d at 1499 (noting possibility of liability exists when partners, by virtue of their status as partners in a partnership, are liable indirectly for the partnership's liability). Thus, if a general partner in a limited partnership would be liable for the partnership's liabilities under Georgia law, such a partner may be vicariously or indirectly liable under CERCLA.

Under Georgia law, "[a] general partner in a limited partnership has the same rights and liabilities of a partner in an ordinary partnership." *Nolan Road W., Ltd. v. PNC Realty Holding Corp.,* 248 Ga.App. 248, 544 S.E.2d 750, 755 (2001); *see also* O.C.G.A. § 14–9A–70 (1994). As such, "partners are jointly and severally liable for all debts and obligations of the

---

**13.** The Georgia Revised Uniform Limited Partnership Act, O.C.G.A. § 14–9–100 (1994 & Supp.2000) contains a definition of "general partner," which states that "[g]eneral partner means a person who: (A) Becomes a general partner upon the formation of a limited partnership ... is named in the certificate of limited partnership as a general partner and has not ceased to be a general partner." O.C.G.A. § 14–9–101(5)(A). While this definition refers to limited partnerships formed af-

ter 1988, the Court believes it is helpful in understanding the concept of a general partner in Georgia.

**14.** The Court notes that in another summary judgment motion in this case filed by Nations-Bank, NationsBank's statement of undisputed material facts includes an assertion the fact that the assets of the Woolfolk Trust included Mr. Woolfolk's general partnership interest in the partnership. (tab 216.)

partnership." O.C.G.A. § 14–8–15 (1994) (citing unamended code section as this was version in effect during the Woolfolk Trust's tenure as general partner). As the Court has already determined that WCW, Ltd. III is a liable party under CERCLA, the Woolfolk Trust is jointly and severally liable for WCW, Ltd. III's CERCLA liability.

### c. Estate of Thomas W. Cleveland

■ Plaintiff originally named Thomas W. Cleveland as a defendant in this case; after his death, however, Plaintiff substituted the Estate of Cleveland as a Defendant. If a decedent would have been a liable party under CERCLA were he presently alive, "the plaintiff should be allowed to look to the decedent's assets, in the hands of the estate or the estate's beneficiaries, to satisfy that liability." *North Carolina ex rel. Howes v. Peele*, 876 F.Supp. 733, 743 (E.D.N.C.1995); *Bowen Eng'g v. Estate of Reeve*, 799 F.Supp. 467, 475 (D.N.J.1992), *aff'd*, 19 F.3d 642 (3d Cir.1994) (noting that "decedent's estate may be held liable for cleanup costs"). Defendants did not object to the substitution of the Estate of Cleveland, nor did Defendants put forth any legal arguments in its response brief regarding the status of the Estate of Cleveland as a defendant. Defendants' arguments against the "trust fund" theory, which were raised with respect to the liability of the beneficiaries of the trusts, are inapplicable as to the Estate of Cleveland, as those arguments focus on the inapplicability of the "trust fund" theory in situations with fully distributed and closed estates. Further, Defendants' arguments against the "trust fund" theory focus on the alleged preemption of CERCLA by the state probate code. Without deciding the preemption issue, the Court notes that Defendants arguments are unpersuasive in this context as Plaintiff timely substituted the estate for Mr. Cleveland, and Defendants have not pointed to any violations of the probate code with respect to this substitution. Accordingly, the Estate of Cleveland was properly substituted for Mr. Cleveland and may be sued.

■ Plaintiff alleges that Cleveland was a general partner in WCW, Ltd. III from 1966 to 1972 and is therefore vicariously or indirectly liable for WCW, Ltd.. III's CERCLA liability. The Estate of Cleveland admits that he was a partner, but claims that he was a partner "in name only." As stated above, Defendants have not cited any authority distinguishing a general partner from one who was a partner in "name only," nor has the Court been able to find any authority for such a distinction. Accordingly, the Court does not give any credence to the Estate of Cleveland's attempt to limit its liability on this basis. In addition to this limited admission, Plaintiff has put forth evidence establishing that Cleveland was a general partner in WCW, Ltd. III. Plaintiff's exhibit 16 is an amendment to the original certificate of limited partnership of WCW, Ltd. III, dated 1966, which states, "Pursuant to their authority under Paragraph 6 of the Supplemental Articles of Partnership, as heretofore amended, the undersigned, constituting all of the partners of WOOLFOLK CHEMICAL WORKS, LTD., do hereby designate T.W. Cleveland as a general partner herein." Exhibit 17 contains two amendments to the original certificate of limited partnership of WCW, Ltd. III, dated July 23, 1968 and May 1, 1969, both of which are executed by T.W. Cleveland in his capacity as general partner. Exhibit 17 also contains an affidavit as to correctness of capital account balances, dated December 1, 1969, and executed by T.W. Cleveland, as well as an amendment to the original certificate of limited partnership of WCW, Ltd., executed by T.W. Cleveland in his capacity as general partner. Further, Plaintiff states

that the "1972 general bill of sale and assignment of assets, properties and business of Woolfolk Chemical Works, Ltd. between WCW, Ltd. and Woolfolk Chemical Works, Inc. is signed by just one person on behalf of the partnership: T.W. Cleveland, as General Partner." (Pl.'s Stmt. Undisputed Material Facts, at ¶ 15.) Defendants do not dispute this statement. The Court notes that this statement reflects that Cleveland represented himself as a general partner to the outside world and that he participated in the operation of the business.[15] Based on the above evidence, the Court finds that there is sufficient evidence to find that Cleveland was a general partner in WCW, Ltd. III from 1966 until 1972. As discussed previously, the Court has found that WCW, Ltd. III is liable under CERCLA. Also, as discussed in the previous section, a general partner in a limited partnership is "jointly and severally liable for all debts and obligations of the partnership." O.C.G.A. § 14–8–15. Based on this evidence, the Estate of Cleveland is vicariously or indirectly liable for WCW, Ltd. III's CERCLA liability. *See Canadyne*, 183 F.3d at 1275; *Redwing Carriers*, 94 F.3d at 1499.

Plaintiff also asserts that the Estate of Cleveland is liable as an owner of the property if the Court determines that the indenture conveyed the Woolfolk real property to WCW, Ltd. in 1941. However, having previously determined that the indenture conveyed the property in 1973, the Court rejects this theory of liability.

### d. Inter Vivos Trusts

Plaintiff's argument that the inter vivos trusts are covered persons within CERCLA rests on its theory that the inter vivos trusts became general partners in WCW, Ltd. I and II. Plaintiff points out that

every change made in the firm name of the general partners, in the nature of the business, or in the capital or shares thereof contributed, held, or owned or to be contributed, held or owned by any of the special partners ... shall dissolve the limited partnership, or if such partnership is continued, shall constitute such partnership a general partnership in respect to all business transacted after such alteration.

O.C.G.A. § 14–9A–121(a).[16] Plaintiff notes that a limited partner's sale of his or her

---

**15.** In its brief, Plaintiff refers to Defendants' answers, in which they assert that Cleveland was not a partner because he did not contribute any capital to WCW, Ltd. III. Defendants have not raised this argument in their response to the motion for summary judgment, nor have they cited any case law in support of this assertion. The Court notes that while the Georgia Uniform Limited Partnership Act contains numerous references to a limited partner's contributions of capital, the Court was unable to find any references to a general partner's capital contributions. *See, e.g.,* O.C.G.A. § 14–9A–20(a)(1)(F) (1994) (discussing formation of limited partnership and noting that certificate should state "[t]he amount of cash and a description and the agreed value of the other property contributed by each limited partner"), O.C.G.A. § 14–9A–40 (1994) (discussing contributions of limited partner); *see also Prodigy Centers/Atlanta No. 1 L.P. v. T–C Assocs. Ltd.,* 269 Ga. 522, 501

S.E.2d 209, 211 (1998) (noting that "the defining characteristic of a limited partnership is that those partners who are limited partners can invest capital in the business of the partnership and take a share in the profits without becoming liable for partnership debts and obligations") (internal quotations omitted). In addition, the Georgia Uniform Limited Partnership Act refers to general Georgia partnership law for the rights and liabilities of general partners, *see* O.C.G.A. § 14–9A–70, and under the Georgia Uniform Partnership Act, a partner need not have contributed capital to be considered a partner. *See Floyd v. Kicklighter,* 139 Ga. 133, 76 S.E. 1011, 1013 (1912).

**16.** Plaintiff notes that under Georgia law, different sets of laws apply to different limited partnerships, depending on the date in which those partnerships were formed. See O.C.G.A. §§ 14–9A–2.1, 14–9A–110, 14–9–

interest in the partnership did not dissolve the limited partnership if "a notice of such sale is filed within ten days thereafter in the office of the clerk with whom the original certificate of partnership was filed." O.C.G.A. § 14–9A–121(c).

WCW, Ltd. I was formed in 1942 by Mr. Woolfolk. Each of his daughters owned approximately 1% of the partnership as special partners. The inter vivos trusts were formed on December 9, 1942, when Mr. Woolfolk's three daughters placed their respective interests in WCW, Ltd. I into inter vivos trusts, which became irrevocable upon Mr. Woolfolk's death. WCW, Ltd. II was formed in 1945, after Mr. Woolfolk's death. The inter vivos trusts were special partners in WCW, Ltd. II. In September 1942, a 3% and two 2% interests in WCW, Ltd. I were transferred from Annie Woolfolk to A.B. Young, Jr., W.C. McConnell, and W.D. Tharpe, respectively. The additional certificate of limited partnership was filed with the Clerk's Office of the Superior Court of Peach County in October 1943. In 1951, a 2% interest was transferred from J.M. Taylor to William H. Taylor. The document conveying the transfer was filed with the Clerk's Office of the Superior Court of Peach County in January 1955. Thus, under Plaintiff's theory, these limited partnerships converted into general partnerships from 1942 until 1945, when WCW, Ltd. II was formed, and from 1951 until 1957, when WCW, Ltd. III was formed. Accordingly, Plaintiff argues that the special partners, including the inter vivos trusts, became general partners in the dissolved partnerships and are therefore "covered persons" within the meaning of CERCLA.

Without addressing the validity of this theory, the Court notes that in order for the inter vivos trusts to be vicariously liable as covered persons via their status as general partners in the general partnerships, Plaintiff would need to demonstrate that there was a disposal of hazardous material during this time period. The Court has previously discussed the evidence presented by Plaintiff in support of this requirement. The Court observed that it believed its duty at the summary judgment stage allowed it to make the obvious inference that the Patchen, Mingledorff Report and the 1971 letters between Thurman and the State Water Quality Control Board referred to disposals occurring in a time frame proximate to the dates of those items. Here, in contrast, the relevant dates range from 1941 to 1957. Plaintiff's argument in support of finding a disposal of hazardous substances during this time period is as follows: "Given that millions of pounds of dry arsenical pesticides were produced while WCW, Ltd. I and II operated the facility, and the fact that all three partnerships produced arsenical pesticides in the same manner, some of the documented releases of arsenic and other hazardous substances must have occurred between 1941 and 1957." (Pl. brief at 9.) The Court notes that this is a motion for summary judgment by Plaintiff and that Plaintiff would bear the burden of proof at trial. As such, Plaintiff "must show *affirmatively* the absence of a genuine issue of material fact: it must support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial." *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1438 (11th Cir.1991) (en banc) (internal quotation marks omitted). The Court finds that Plaintiff has introduced insufficient evidence to show a disposal of a hazardous substance during the relevant time period.[17] The Court is not

1201, 14–9–1202. (1994). Thus, WCW, Ltd. I and II are governed by O.C.G.A. §§ 14–9A–110 to –130 (1994), because they were formed prior to 1952.

17. The Court notes that rather than the time period of 1941 to 1957, the relevant time

willing to assume, as Plaintiff argues, that "some of the documented releases of arsenic and other hazardous substances must have occurred between 1941 and 1957." Accordingly, the Court does not believe that Plaintiff has met its burden with respect to establishing the disposal of a hazardous substance during the relevant time period and does not find the inter vivos trusts liable on this basis.

Plaintiff also puts forth an alternative argument that the inter vivos trusts are liable as owners of the facility if the indenture conveying title to the facility property from the shareholders to WCW, Ltd. I was valid as of 1941. As discussed previously, the Court has determined that the title to the property was not conveyed by the indenture until 1973. Accordingly, Plaintiff's theory of liability on this basis is rejected.

### e. Jacqueline Mathes

Plaintiff argues that Jacqueline Mathes is a "covered person" under § 107(a)(2) of CERCLA, as an individual who owned property during the disposal of a hazardous substance. Plaintiff's argument is based on an assertion that the indenture did not convey the facility property from the individual shareholders, who included Jacqueline Mathes, to WCW, Ltd., until 1973. Defendants have presented no arguments contrary to this position, apart from their assertion that the indenture conveyed the property in 1941 rather than 1973. As discussed previously, the Court finds that title was transferred in 1973.

Plaintiff must also show that there was a disposal of a hazardous substance during Mathes's ownership. The relevant time period, 1941–1973, encompasses the time

period discussed in the previous section as to WCW, Ltd. III. Accordingly, the Court's previous conclusion that a disposal took place between 1957 and 1972 applies here, and the Court finds that there was a disposal of a hazardous substance during Mathes's ownership. Based on these facts, the Court finds that Mathes was a "covered person" under CERCLA.

### f. John C. Alden and Betty L. Hewes

Plaintiff argues that Alden and Hewes are vicariously liable under § 107(a)(2) of CERCLA as previous owners of the facility. Both Alden and Hewes were special partners in WCW, Ltd. II. As with the inter vivos trusts, Plaintiff argues that Alden and Hewes became general partners when WCW, Ltd. II failed follow procedural requirements in 1951 and thereby allegedly converted into a general partnership. As discussed above, however, the Court does not believe that Plaintiff has met its burden of showing a disposal of a hazardous substance during the time period in which Alden and Hewes were alleged to be general partners. Accordingly, the Court rejects this theory of liability for Alden and Hewes. Also, Plaintiff argues that if title to the facility were transferred to the partnership via the indenture in 1941, then Alden and Hewes would, as general partners, have held title to the facility as tenants-in-common. The Court's conclusion that there was no proof of a hazardous disposal during this time period prevents a finding that Alden and Hewes were covered persons under this theory of liability. Also, as discussed above, title was not transferred until 1973. Thus, Plaintiff's argument that Alden and Hewes are liable

periods for determining whether a disposal of a hazardous material occurred may be from 1942 to 1945 and from 1951 to 1957, the dates during which the alleged general partnerships functioned. Under either set of

dates, the Court's conclusion is the same— Plaintiff has not put forth sufficient evidence to demonstrate that there was a disposal during that time period.

parties under CERCLA based on this theory is rejected.

### g. The Inter Vivos Trusts and Beneficiaries

Plaintiff argues that the beneficiaries and the inter vivos trusts are liable under the "trust fund" theory. The "trust fund" theory is premised on the idea that "a beneficiary is deemed to hold the assets received from a liable party's estate in trust for the benefit of satisfying environmental liabilities of a deceased, responsible person." *North Carolina ex rel. Howes,* 876 F.Supp. at 743. This theory is intended to fulfill CERCLA's remedial purpose by allowing a plaintiff "to look to the decedent's assets, in the hands of the estate or the estate's beneficiaries to satisfy that liability." *Id.*

Plaintiff asserts that all four trusts originated from and include Mr. Woolfolk's interest in the Woolfolk company and partnership.[18] Plaintiff argues that because of Mr. Woolfolk's role as owner, operator, and general partner in the Woolfolk pesticide business, he would liable under CERCLA were he still alive. Thus, Plaintiff's argument for holding the trusts and beneficiaries liable is premised on a finding that were Mr. Woolfolk alive today, he would be a "covered person" under CERCLA. Mr. Woolfolk was involved with the Woolfolk chemical business for approximately twenty to twenty-five years. Without addressing Mr. Woolfolk's role as an owner or operator of the sole proprietorship, the J.W. Woolfolk Company, or WCW, Ltd., I, the Court notes that in order for Mr. Woolfolk to be a "covered person" under CERCLA, Plaintiff must establish a disposal of a hazardous substance during this time period, from approximately 1921 to 1945. Plaintiff's evidence, however, fails to establish a disposal during this time period. Because the Court has determined that Plaintiff has not met its burden with respect to showing that Mr. Woolfolk was a "covered person," the Court need not address the viability of the "trust fund" theory or address Defendants' alternative defenses. Thus, the Court rejects Plaintiff's argument that the inter vivos trusts and the beneficiaries of both the inter vivos trusts and the J.W. Woolfolk Trust are "covered persons" under the "trust fund" theory.

### C. Georgia Hazardous Site Response Act

Plaintiff also argues that Defendants are liable under the Georgia Hazardous Site Response Act (HSRA). In large part, HSRA is based on the liability provisions of CERCLA. *Briggs & Stratton Corp.,* 20 F.Supp.2d 1356, 1374 (M.D.Ga.1998) (noting scarcity of case law interpreting HSRA and commenting that HSRA is based in large part on CERCLA liability provisions); *see also Canadyne–Georgia,* 183 F.3d at 1272 n. 3 (noting that "HSRA incorporates the same definitions and standards for owner liability as CERCLA"). HSRA "creates a private right of action

---

**18.** The Court does not believe that Plaintiff has sufficiently shown that the inter vivos trusts contained interests derived from Mr. Woolfolk. Plaintiff notes that the inter vivos trusts hold Mr. Woolfolk's daughters' interests in the Woolfolk partnerships. Although Plaintiff surmises that the daughters' interests came directly from Mr. Woolfolk, Plaintiff has not offered any evidence on the matter, and Defendants dispute this assertion in their response to Plaintiff's statement of undisputed material facts. This lack of evidence is demonstrated by Plaintiff's glib statement: "Given this, it is more likely than not that the daughters' interest in the J.W. Woolfolk Company, and therefore their interests in WCW, Ltd., came directly from Mr. Woolfolk himself." The Court finds that this evidence is not sufficient to satisfy Plaintiff's burden of establishing that the inter vivos trusts are liable because they hold Mr. Woolfolk's interest.

for recovery of the costs of corrective action." *Briggs & Stratton Corp.,* 20 F.Supp.2d at 1374–75. Under HSRA, "[d]uring or following the undertaking of corrective action, any person may seek contribution from any other person who has contributed or is contributing to any release of a hazardous waste, a hazardous constituent, or a hazardous substance." O.C.G.A. § 12–8–96.1(e). HSRA defines "person" by incorporating the four categories of covered persons identified in § 107 of CERCLA. O.C.G.A. 12–8–92(9). For the purposes of the present action, "person" is defined as "[a]ny person who at the time of disposal of any hazardous waste . . . owned or operated any facility at which such hazardous waste was disposed of." O.C.G.A. § 12–8–92(9). HSRA has also adopted CERCLA's definition of "facility" and has identified similar substances as being "hazardous substances." *Compare* O.C.G.A. § 12–8–92(3), *and* O.C.G.A. § 12–8–92(4), *with* 42 U.S.C.A. § 9601(9), *and* 42 U.S.C.A. § 9601(14).

Because HSRA incorporates CERCLA's definitions and standards for "covered persons," the Court hereby adopts the reasoning set forth in the previous discussion of the CERCLA claims with respect to the HSRA claims. *See Canadyne–Georgia,* 183 F.3d at 1272 n. 3; *see also Briggs & Stratton Corp.,* 20 F.Supp.2d at 1374–76 (noting similarity between HSRA and CERCLA and adopting CERCLA standards with respect to HSRA claims). Accordingly, WCW, Ltd. III, the Woolfolk Trust, and Jacqueline Woolfolk Mathes are directly liable under HSRA, and the Woolfolk Trust and the Estate of Cleveland are vicariously or indirectly liable for WCW, Ltd. III's HSRA liability.

**D. Declaratory Judgment**

■ Plaintiff further requests that the Court enter a declaratory judgment pursuant to § 113(g)(2) of CERCLA stating that the liable Defendants are liable for future response costs relating to the site. Section 113(g)(2) provides, "In any such action described in this subsection [§ 107], the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages." 42 U.S.C.A. § 9613(g)(2). Many courts have assumed that § 113(g)(2) refers to actions brought pursuant to § 107, *see, e.g., In re Dant & Russell, Inc.,* 951 F.2d 246, 249 (9th Cir. 1991), and at least one court in the Eleventh Circuit has stated that this provision applies exclusively to actions brought pursuant to § 107. *See Reichhold Chems., Inc. v. Textron, Inc.,* 888 F.Supp. 1116, 1124 (N.D.Fla.1995). The action in this case is brought pursuant to § 113; thus, the mandatory language requiring the court to enter a declaratory judgment is not applicable here. *See Boeing Co. v. Cascade Corp.,* 207 F.3d 1177, 1191–92 (9th Cir.2000); *Reichhold Chems., Inc.,* 888 F.Supp. at 1124. Although *Boeing* recognizes that § 113(g)(2) refers specifically to actions brought pursuant to § 107, the Ninth Circuit also acknowledges that the express and mandatory language in § 113(g)(2) does not exclude the possibility of declaratory relief in contribution actions. *Boeing Co.,* 207 F.3d at 1191–92. The Ninth Circuit further notes that CERCLA's purposes of quick response and placement of costs on responsible persons would be fulfilled by issuing declaratory judgments in contribution actions. *Id.* at 1191. Accordingly, the Court will determine whether declaratory relief is appropriate for both the CERCLA and the HSRA claims as to those defendants found liable.

■ As required by the Article III "case or controversy" requirement, the Declaratory Judgment Act, 28 U.S.C.A. § 2201, "provides that a declaratory judg-

ment may be issued only in the case of an 'actual controversy.'" *Malowney v. Federal Collection Deposit Group,* 193 F.3d 1342, 1347 (11th Cir.1999). "The Plaintiff must allege facts from which the continuation of the dispute may be reasonable inferred. Additionally, the continuing controversy may not be conjectural, hypothetical, or contingent; it must be real and immediate, and create a definite, rather than speculative threat of future injury." *Emory v. Peeler,* 756 F.2d 1547, 1552 (11th Cir.1985). Here, Plaintiff has seemingly relied on its presumption that the entry of a declaratory judgment by the Court would be mandatory and has not supplied the Court with any facts reflecting that the controversy is continuing. Plaintiff has not referenced any future costs that it is likely to incur, nor has it even implied that there are any remaining future cleanup costs. Because of Plaintiff's failure to show the Court facts entitling it to declaratory judgment on CERCLA and HSRA liability, the Court finds that declaratory judgment is inappropriate at this stage.

### IV. Conclusion

As discussed in the foregoing sections, the Court finds as follows. As to the first three factors required for liability under CERCLA, Plaintiff has shown that 1) the Woolfolk site is a facility as defined by CERCLA, 2) there was a hazardous release at the site, and 3) the release has caused Plaintiff to incur response costs consistent with the NCP. In addition, with respect to the fourth factor, whether the defendant is a "covered person," the Court finds that Plaintiff has satisfied its burden as to this requirement for WCW, Ltd. III, the Woolfolk Trust, and Jacqueline Mathes. The Court also finds that Plaintiff has met its burden of showing that the Woolfolk Trust and Cleveland were general partners in WCW, Ltd. III. Accordingly, the Court **GRANTS** Plaintiff's partial sum-

mary judgment motion for CERCLA and HSRA liability as to Defendants WCW, Ltd. III, the Woolfolk Trust, and Jacqueline Mathes and as to the vicarious or indirect liability of the Woolfolk Trust and the Estate of Cleveland for WCW, Ltd. III's CERCLA and HSRA liability. The Court **DENIES** Plaintiff's summary judgment claims for liability as to the remaining Defendants. In addition, the Court **DENIES** Plaintiff's summary judgment motion for a declaratory judgment as to future response costs.